**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GEORGE M. TOMLINSON,<br>SHARON MADSEN,<br>CAPITAL MATRIX MANAGEMENT,<br>ASSOCIATION VERELST,<br>and LUC VERELST,<br><br>    Plaintiffs,<br><br>  v.<br><br>GOLDMAN, SACHS & CO., and<br>JOHN M. YOUNGDAHL,<br><br>    Defendants. | FILED: MARCH 11, 2009<br>09CV1543<br>JUDGE BUCKLO<br>MAGISTRATE JUDGE ASHMAN<br>CH<br><br>No.<br><br>**JURY TRIAL DEMANDED** |

### COMPLAINT

Plaintiffs, through undersigned counsel, respectfully submit this Complaint against Goldman, Sachs & Co. and John M. Youngdahl (collectively, "Defendants").

### NATURE OF THE CASE

1.  Plaintiffs file this complaint to preserve their claims in light of the denial of class certification on August 22, 2008 in *Premium Plus Partners L.P. v. Davis, et al.*, Case No. 04-1851.

2.  The claims of Plaintiffs herein are brought under the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, which prohibits manipulation of the commodities markets. As alleged herein, Goldman, Sachs & Co. ("Goldman") and its employee John M. Youngdahl ("Youngdahl") manipulated the markets for 30-Year Futures and Options.

3.  Goldman was able to manipulate these markets as a result of its theft of government information. In particular, Goldman entered into an illicit agreement with co-conspirator Peter J. Davis, Jr. ("Davis") whereby Davis agreed to provide Goldman employee

Youngdahl with embargoed, non-public information concerning an important United States Department of Treasury decision on October 31, 2001. Within minutes of receiving this non-public information, Goldman amassed contemporaneous long positions in 30-Year Futures and CBOT-deliverable 30-Year Bonds. Goldman then retained these ill-gotten long positions for a significant period of time after the public release of the Treasury Department's decision and throughout the day on October 31, 2001, causing artificially high prices in 30-Year Treasury Futures and Options (long positions) throughout the trading day of October 31, 2001. Both Youngdahl (Goldman's employee) and Davis have pled guilty to criminal conduct in connection with this scheme, as set forth fully below.

## JURISDICTION AND VENUE

4.    The Court's jurisdiction is based on 28 U.S.C. § 1331 (federal question jurisdiction). The federal claims alleged herein arise under Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25.

5.    Venue is proper in this district pursuant to U.S.C. § 1391(b) because substantial events giving rise to Plaintiffs' claims occurred in this district.

## THE PARTIES

**I.    Plaintiffs.**

6.    George M. Tomlinson is an individual residing in Hinsdale, Illinois. Tomlinson held short positions in 30-Year December Futures as of 9:35 a.m. on October 31, 2001, covered those short positions on October 31, 2001 at prices which were artificially inflated by Defendant's misconduct, and suffered aggregate trading losses of approximately $143,968.75.

7.    Sharon Madsen is an individual residing in Laguna Beach, California. Madsen held short positions in 30-Year December Options as of 9:35 a.m. on October 31, 2001, covered

those short positions on October 31, 2001 at prices which were artificially inflated by Defendants' misconduct, and suffered aggregate trading losses of approximately $44,467.32.

8.    Capital Matrix Management is an investment fund registered in the British Virgin Islands with its principal place of business in Verbier, Switzerland.  Capital Matrix Management held short positions in 30-Year December Options as of 9:35 a.m. on October 31, 2001, covered those short positions on October 31 and November 1, 2001 at prices which were artificially inflated by Defendants' misconduct, and suffered aggregate trading losses of approximately $135,181.21.

9.    Luc Verelst  is an individual residing in in Verbier, Switzerland.  Luc Verelst held short positions in 30-Year December Options as of 9:35 a.m. on October 31, 2001, covered those short positions on October 31 and November 1, 2001 at prices which were artificially inflated by Defendants' misconduct, and suffered aggregate trading losses of approximately $2,900,285.20.

10.    Association Verelst is a foundation organized under the laws of Switzerland and located in Verbier, Switzerland.  Association Verelst held short positions in 30-Year December Options as of 9:35 a.m. on October 31, 2001, covered those short positions on October 31 and November 1, 2001 at prices which were artificially inflated by Defendants' misconduct, and suffered aggregate trading losses of approximately $580,057.06.

11.    The statute of limitations for the claims of Plaintiffs was tolled by the March 10, 2004 filing of the class action complaint in *Premium Plus Partners L.P. v. Davis, et al.*, Case No. 04-1851.

**II.      Defendants and Co-Conspirators.**

12.     Defendant Goldman, Sachs & Co. is a Delaware corporation with its principal place of business in New York, New York.  At all material times, Goldman regularly traded in 30-Year Bonds, Futures and Options for its own accounts and for the accounts of its clients.

13.     Defendant John M. Youngdahl is a resident of Summit, New Jersey.  At all material times, Youngdahl was a Vice President and Senior Economist in the Global Economics Group at Goldman.  Youngdahl also had a law degree and an M.B.A.  Youngdahl sat on Goldman's Treasury Desk – a division within its Interest Rates Products Department – and provided Goldman traders with advice on economic and other matters affecting the Treasury markets, including the policies and actions of the United States Department of the Treasury.  *See United States of America v. John Youngdahl*, 1:03-cr-00991-DLC, Indictment ("Indictment") (S.D.N.Y. Sept. 4, 2003), attached as Ex. 1, at ¶¶ 2, 4 and 5.

14.     Co-conspirator Peter J. Davis, Jr.,[1] is a resident of Washington, D.C.  At all material times, Davis was a political consultant and the President of Davis Capital Investment Ideas ("Davis Capital"), a sole proprietorship with its offices in the District of Columbia.  Prior to forming Davis Capital, Davis held various positions in the federal government, including serving as an economist with the Joint Committee on Taxation and the Senate Budget Committee.  At all material times, Davis provided consulting services to his clients relating to government economic policy through Davis Capital.  *See* Indictment at ¶¶ 1, 2 and 5.

---

[1]     In case No. 04-1851, the plaintiff agreed to voluntarily dismiss Peter J. Davis, Jr. without prejudice and subject to his cooperation in discovery and at trial.  On January 30, 2008, the Court presiding over Case No. 04-1851 entered an order granting the motion to voluntarily dismiss Davis, subject to the terms and conditions set forth in the motion, namely Davis' cooperation in discovery and at trial.

## FACTUAL ALLEGATIONS

**I.     The Treasury Department.**

15.     The United States Department of the Treasury ("Treasury Department") is a department within the executive branch of the federal government. It is composed of various divisions responsible for, among other things, federal debt finance and debt management. It periodically auctions debt obligations issued by the United States such as 30-Year Bonds.

16.     At quarterly refunding announcements, the Treasury Department makes public statements concerning the debt financing requirements of the United States Government and the types of Treasury Securities that will be auctioned. The quarterly refunding conferences often take place at 1500 Pennsylvania Avenue, Washington, D.C.

17.     In 2001, it was widely known that information revealed during the quarterly refunding conferences was to be held strictly confidential by those present until the termination of an "embargo" period set by the Treasury Department. Attendees were not permitted to disseminate the embargoed information to third parties. The embargo system was imposed by the Treasury Department to ensure that its quarterly refunding announcements were understood by the press and accurately conveyed to the public at large in a uniform, simultaneous fashion. Indictment ¶9; *see also United States v. Peter J. Davis, Jr.*, 1:03-cr-1054-SAS, Plea Hearing Transcript ("Davis Plea") (S.D.N.Y. Sept. 3, 2003), attached as Ex. 2, at 19:11-14.

**II.     The Treasury Markets.**

18.     30-Year Treasury Bonds ("30-Year Bonds") are issued and initially auctioned by the Treasury Department. After the initial auction, the 30-Year Bonds are traded on the "over the counter" markets, which are informal exchanges set up and maintained by private financial institutions to facilitate orderly trading in those instruments. 30-Year Bonds may be "on-the-

run" or "off-the-run."  On-the-run bonds are the most recently issued bonds.  For example, on October 31, 2001, the 30-Year Bond maturing on February 15, 2031 was the "on-the-run" 30-Year Bond.  On-the-run bonds are typically the most actively traded.  Off-the-run bonds are those issued before the on-the-run bond.  For example, on October 31, 2001, any 30-Year Bonds issued after October 31, 1970 but before February 15, 2001 would be considered off-the-run.

19.     30-Year Treasury Bond Futures contracts ("30-Year Futures") are traded on the CBOT.  The financial instrument or commodity underlying the 30-Year Future is the 30-Year Bond.  A seller of a 30-Year Future assumes a "short" position and agrees to deliver $100,000 in 30-Year Bonds for an agreed price in the specified contract month.  A buyer of a 30-Year Future assumes a "long" position and agrees to take delivery of $100,000 in 30-Year Bonds for an agreed price in a specified contract month.  The CBOT specifications for the 30-Year Futures contract delineate the specific 30-Year Bonds that are deliverable against the Futures contract (hereinafter "CBOT-specified 30-Year Bonds").  Goldman's manipulation included trading in these CBOT-specified 30-Year Bonds.

20.     Options on 30-Year U.S. Treasury Futures ("30-Year Options") are also traded on the CBOT.  The financial instruments or commodities underlying 30-Year Options are the CBOT-specified 30-Year Bonds and 30-Year Futures.  30-Year Options come in two forms: the "put option" and the "call option."  With respect to "put options," the buyer purchases the right to assume a "short" position in one 30-Year Future of a specified contract month at a "strike price" set at the time the option was purchased prior to the expiration of the option, and the seller agrees to assume a "long" position in a 30-Year Future of a specified contract month at a strike price set at the time the option was sold, upon exercise by a put option buyer.  With respect to "call options," the buyer purchases the right to assume a "long" position in one 30-Year Future

of a specified contract month at the strike price set at the time the option was purchased prior to the expiration of the option, and the seller agrees to assume a "short" position in a 30-Year Future contract of a specified contract month at a strike price set at the time the option was sold, upon exercise by the call option buyer.

### III.    Treasury Market Conditions In 2001.

21.    In early 2001, the United States had a budget surplus. As a result, the Treasury Department began to consider elimination of the 30-Year Bond.

22.    In early 2001, the media reported that the Treasury Department might stop issuing 30-Year Bonds. On January 2, 2001, for example, one newspaper reported that "This year the Treasury could stop selling new 30-year bonds." *Markets & Investing; Some Opportunities Are Seen in Bonds*, NEW YORK TIMES p. C11 (Jan. 02, 2001).

### IV.    Goldman Hires A Treasury Department Mole.

23.    In early 2001, around the time the Treasury Department began to consider cancellation of the 30-Year Bond, Goldman decided to hire a consultant "with relationships at the Treasury Department." *United States v. John Youngdahl*, 1:03-cr-0091-DLC, Transcript from Plea Hearing ("Youngdahl Plea") (S.D.N.Y. Nov. 12, 2003), attached as Ex. 3, at p. 17.

24.    By the spring of 2001, Goldman had identified Peter J. Davis, Jr. as a source for advance information regarding the Treasury Department's decision on 30-Year Bonds. Davis ran his own company, Davis Capital, and provided information to his clients about certain news in the market, including information Davis learned from the Treasury Department. Davis regularly attended the Treasury Department's confidential quarterly refunding conferences. During those meetings, the attendees were briefed on the economy. Davis was able to attend these meetings after receiving special authorization from the Treasury Department Assistant

Secretary sometime in 1994 or 1995. As a precondition to his authorization to attend these meetings, Davis had to agree to honor the embargos imposed on these meetings as well as sign a confidentiality agreement.

25. Goldman knew Davis was invited by the Treasury Department to attend its quarterly refunding conferences. Indictment ¶ 10. Goldman also knew Davis would have advance knowledge of any decision to cancel 30-Year Bonds as a result of his regular attendance at the quarterly refunding conferences. Goldman hired Davis beginning in the spring of 2001. Indictment ¶2. Goldman's primary liaison with Davis was its vice-president Youngdahl.

26. Davis fully understood that the information disclosed during these quarterly refunding conferences was to be held strictly confidential until the expiration of the embargo period. Indictment ¶2.

**V. Goldman Asks Davis To Agree To Provide Pre-Embargo Information From Refunding Conferences, Including Information Concerning The Cancellation Decision.**

27. On or about July 12, 2001, Goldman and Davis entered into an agreement whereby Davis agreed to provide Goldman with information concerning Treasury Department announcements prior to the end of the applicable embargo period. Indictment ¶12; Youngdahl Plea p. 18:9-12; Davis Plea p. 20:2-9.

28. In particular, on or about July 12, 2001, Youngdahl sent an email from his computer at Goldman's offices in New York to Davis acknowledging that Davis had provided Youngdahl with information from the quarterly refunding conference on May 2, 2001 before it was made public by the Treasury Department. Youngdahl asked if Davis could do so as a "routine matter" beginning with the August refunding conference. Indictment ¶13.

29. Youngdahl's email was as follows:

Subject:
From: 'Youngdahl, John' johnyoungdahl@gs.com
Date: 7/12/01 1:18 p.m.
To: 'pete@daviscap.com' pete@daviscap.com

Last quarter you called me on the morning of the Treasury refunding press
conference, to give me details from the briefing just before they hit the tape. Were
you in the press room that morning for the briefing, or did you get the info from
somewhere else?  Is this something that we can arrange as a routine matter (the
next occasion will be Aug 1AM)?

Indictment ¶13; *see also* Youngdahl Plea p. 19:16-24 (acknowledging existence of emails).

30.     Davis replied that he did attend the quarterly refunding conferences and would

call Youngdahl to report on the announcements made by the Treasury Department at the

conference before the embargo time:

Subject: Re:
From: 'Pete Davis' pete@daviscap.com
Date: 7/12/01 2:15 p.m.
To: 'Youngdahl, John' john.youngdahl@gs.com

I attend the quarterly briefings and can call a few minutes before with the
understanding that everything is embargoed until the embargo time.

Indictment ¶14; *see also* Youngdahl Plea p. 19:16-24 (acknowledging existence of emails).

31.     Youngdahl replied as follows:

Subject: Re:
From: 'Youngdahl, John' john.youngdahl@gs.com
Date: 7/12/01 2:22 p.m.
To:  'Pete Davis' pete@daviscap.com

We should chat about this just to be sure the ground rules are clear in advance [.]

Indictment ¶15; *see also* Youngdahl Plea p. 19:16-24.

32.     As Davis stated under oath:

On July 12, 2001, I received an email from Mr. Youngdahl in which Mr.
Youngdahl acknowledged that I had provided him with pre-embargo information
relating to the May 2001 refunding press conference.   In that email, Mr.
Youngdahl also asked me if I would give pre-embargo information to him as a,

quote, routine matter, unquote, beginning with the August 1, 2001 quarterly refunding press conference. That same day, I replied to Mr. Youngdahl via e-mail and informed him that I would call him with that information before the embargo expired, quote, with the understanding that everything is to be embargoed until the embargo time, unquote. Shortly thereafter, I had a telephone conversation in which the details of this arrangement were confirmed.

Davis Plea p. 20:10-22.

33.    Sometime thereafter, Youngdahl and Davis had a telephone conversation during which Youngdahl confirmed the agreement pursuant to which Davis would convey embargoed, confidential information in advance of the public release. Indictment ¶16.

34.    The email sequence set forth above makes it clear that Goldman and Goldman's employee, John Youngdahl, initiated the illicit request to receive information prior to expiration of the Treasury Department's embargo period.

**VI.    In Accordance with Their Agreement, Davis Provides Goldman with Embargoed Information from the August 1, 2001 Conference.**

35.    The Treasury Department held a quarterly refunding conference on August 1, 2001.    Pursuant to their agreement, Davis called Youngdahl prior to the expiration of the embargo period and informed him of the Treasury Department's announcements. Davis Plea p. 20:23-21:1.

36.    The August 1, 2001 call was Goldman's second opportunity (after the May 2, 2001 quarterly refunding conference) to gain confidence in the reliability of Davis' information. Indictment ¶¶13, 20.

37.    The reliable information from the May and August quarterly refunding conferences provided Goldman with growing confidence that it could rely on Davis and use information from him to make specific trades shortly before the information became public in a manner that would move (i.e., manipulate) the market.

## VII. The October 31, 2001 Treasury Department Announcement.

38.     On October 30, 2001, the Treasury Department announced that the quarterly refunding conference would take place at 9:00 a.m. on October 31, 2001.  The press release clearly stated that "The event will have a 10:00 a.m. news embargo."

39.     Also on October 30, 2001, the Treasury Advisory Committee held a meeting and issued a report to the Treasury Department.  At all material times, John Tormondsen, the Managing Director of Goldman Sachs who supervised the Treasury Desk, represented Goldman on the Treasury Advisory Committee.  *See In re Goldman, Sachs & Co.*, Admin Proc. File No. 3-11240, Order Instituting Administrative and Cease-and-Desist Proceedings ("Cease-and-Desist Order") (Sept. 4, 2003), attached as Ex. 4, at p. 4.  Because of Tormondsen's role on the Treasury Advisory Committee, Goldman knew there would be a quarterly refunding conference on the morning of October 31, 2001.

40.     Furthermore, Youngdahl and at least two other Goldman traders had prior knowledge that the Treasury Department was going to make its quarterly refunding announcement on the morning of October 31, 2001.  *See* Cease-and-Desist Order p. 4.

41.     On October 31, 2001, Davis attended the Treasury Department's quarterly refunding conference, which was held at 1500 Pennsylvania Avenue, Washington, D.C. Indictment ¶23; Davis Plea at p. 21:2-4.

42.     During the conference, Peter Fisher, Undersecretary of the Treasury Department, announced that the Treasury Department was suspending issuance of 30-Year Bonds.  Davis Plea p. 21:2-4.  The conference concluded at approximately 9:25 a.m.  The information relayed at the conference was embargoed until 10:00 a.m.

43.     At 9:30 a.m., or shortly thereafter, before the embargo period expired, in accordance with the agreement between Goldman and Davis, Davis called Youngdahl at Goldman's Manhattan offices and informed Youngdahl that the Treasury Department had announced it would no longer issue 30-Year Bonds.  Davis Plea p. 21:9-15; Youngdahl Plea p. 18:15-20; Indictment ¶26.  Davis did not wait until he returned to his office to make this call, but rather called Youngdahl from his cell phone while standing outside 1500 Pennsylvania Avenue.

44.     Davis knew Goldman would use the information for trades in the Treasury markets:

> I told Mr. Youngdahl that Treasury had decided to discontinue the 30-year bond. I also told Mr. Youngdahl that the information was embargoed until 10:00 a.m.  My call to him took place around 9:30 a.m.  My expectation was that Mr. Youngdahl and Goldman Sachs would use the information to their advantage in trading government securities.

Davis Plea p. 21:11-22.

45.     Davis knew that his pre-embargo report to Youngdahl would allow Goldman to make significant moves before the market responded to the official public release of the announcement that 30-Year Bonds were being discontinued.  Davis Plea p. 21:11-22.

46.     Youngdahl "understood that this information was significant news, that the consultant had learned this information at the [Treasury] briefing, that the embargo had not yet expired, and by providing the information to me [Davis] was violating that embargo." Youngdahl Plea p. 18:21-24.

## VIII.   Goldman Engages In Manipulative Trading.

47.     After receiving Davis' call, Youngdahl immediately relayed the information to a Goldman trader.  Youngdahl Plea p. 18:25-19:2.  Youngdahl knew the trader "would use that information to trade for Goldman's benefit."  Youngdahl Plea p. 20.  Youngdahl "expected that

Goldman would profit from the information and that this would ultimately benefit [Youngdahl] as a member of Goldman Sachs … ." Youngdahl Plea p. 20:14-16.

48.    In September 2003, the Department of Justice and Securities Exchange Commission reported, for the first time, that between 9:35 and 9:43 a.m., Goldman's Treasury Desk bought 2,336 December Futures contracts (representing $233.6 million worth of Bonds) and $84 million in "on-the-run" 30-Year Bonds that, pursuant to CBOT specifications were deliverable against the December Futures contract. Indictment ¶28.

49.    Upon information and belief, Goldman engaged in other, currently undisclosed transactions in 30-Year Futures and Options and CBOT-specified 30-Year Bonds in accounts for Goldman's customers and Goldman-controlled hedge funds and investment programs (i.e., non "firm accounts"). The information and belief that Goldman engaged in such transactions is based on Goldman's financial wherewithal, its status as one of Wall Street's largest broker-dealers, its status as a large investment bank, and the fact that it is a primary dealer in 30-Year Bonds.

50.    The press did not begin reporting on the Treasury Department's decision until shortly before 10:00 a.m. Specifically, Reuters announced the suspension decision at approximately 9:57 a.m. A Treasury Department employee may have posted the October 31, 2001 announcement on the Treasury Department's website sometime before 10:00 a.m. and one report suggests that the Treasury Department server would have updated the new webpage at approximately 9:43 a.m. In any event, Goldman acquired the vast majority of its ill-gotten long position by approximately 9:43 a.m. and retained the long position for a significant period after 9:57 a.m.

51.

IX.     **The Market Reacts to Goldman's Manipulative Trading.**

52.     Goldman's manipulative acquisition of the long position shortly before the Treasury Department's announcement was made public and its retention of the long position for a significant period of time after public release of the Treasury Department's announcement caused the prices of 30-Year Futures and long positions in 30-Year Options to increase dramatically to artificial levels and to remain at artificially high levels throughout the trading day on October 31, 2001. In the absence of Goldman's conduct, the prices of 30-Year Futures and Options (long positions) would not have experienced such a dramatic increase.

53.     The price jumps on October 31, 2001 were abnormal and artificial.  30-Year Bond prices were expected to remain relatively flat notwithstanding the Treasury Department's announcement.  Peter Fisher, the Treasury Undersecretary who made the decision, and many on his team of economists in the Treasury Department, studied this specific issue and predicted that announcement of the decision would not cause a dramatic price increase on October 31, 2001.

54.     Indeed, 30-Year Bond, Futures and Options prices ultimately settled near their pre-announcement levels on or about November 2, 2001 and continued to decline throughout the remainder of November, which strongly indicates that the Treasury Department's decision did not cause the dramatic price increase.

55.     Moreover, in similar situations, when the Treasury Department decided to stop issuing a particular Treasury note or bond, prices remained relatively flat on the day of the announcement.

X.      **Goldman Covers Up Its Misconduct – Fraudulent Concealment.**

56.     As further set forth below, Plaintiffs did not know and could not have known in the exercise of reasonable diligence of their claims against Goldman until such time as the results

14

of the government investigations were publicly disclosed in September 2003, including because: Goldman's trading activity in 30yr CBOT futures and 30yr CBOT-specified bonds was not public information; Goldman and Youngdahl took numerous steps to conceal their wrongdoing from Plaintiffs and the investing public; and even after the commencement of government investigations, Goldman continued to act to conceal its misconduct and stymied the investigation, including by public misrepresentations disavowing any wrongful conduct.

57.     At some point after October 31, 2001, the Department of Justice, the Securities Exchange Commission and the Treasury Department commenced confidential, non-public investigations concerning Goldman's trades in the 30-Year market and its relationship with Davis.  The results of those investigations and the nature of Goldman's relationship with Davis and its misconduct were not revealed until September 3, 2003.

58.     At all times during the period October 31, 2001 through September 3, 2003, Goldman falsely denied any wrongdoing or trading on any information received from Davis.

59.     In November 2001, Goldman issued a public statement that it had engaged in no wrongdoing: "Goldman Sachs didn't engage in wrongful behavior and will assist authorities with an investigation."  *Goldman Sachs Warned of Bond-Sale Stoppage*, *L.A. Times*, Markets p. 4 (Nov. 13, 2001).

60.     Far from assisting the confidential federal investigations, Goldman attempted to mislead the federal investigators.  For example, in connection with the Treasury Department's non-public investigation, on or about November 6, 2001, Fran Bermanzohn, Goldman's General Counsel for its 6th Income Division, informed the Treasury Department that, while Youngdahl had received a call from Davis at approximately 9:35 a.m., Davis had not informed Youngdahl that the information was embargoed or that his information came from the Treasury Department

refunding conference. *See* Report of Investigation, No. 2002-0104, United States Department of Treasury Office of Inspector General (Jan. 2, 2001) p. 3. This statement by Goldman to the Treasury Department was false and misleading. The email exchange between Davis and Youngdahl makes clear that Youngdahl knew that he was receiving pre-embargo information from the quarterly refunding conferences.

61.     Around March 2002, the Securities Exchange Commission announced it was investigating whether Goldman engaged in improper trading activity on October 31, 2001. In response, Goldman "publicly denied engaging in any wrongful behavior … ." *Goldman Faces Charges In Bond Case, Marketwatch* (Mar. 29, 2002).

62.     On or about April 6, 2002, during a shareholder meeting, Goldman's then-Chairman and Chief Executive Officer, Henry M. Paulson, stated "there is absolutely no basis for bringing charges against Goldman, Sachs or any of the employees involved." *Goldman Chief Denies Firm Violated Any S.E.C. Rule*, *New York Times* p. C2 (April 6, 2002).

63.     Goldman not only denied wrongdoing, but its employee actively hindered the government investigations. On or about August 15, 2002, Youngdahl and his attorneys attended an interview with a Criminal Investigator and an Assistant United States Attorney in the Southern District of New York. Indictment ¶45. Youngdahl falsely stated that he never had discussions or communications with Davis and had never entered into an agreement with Davis to receive information concerning Treasury Department announcements in advance of the embargo period. *Id*. ¶46.

64.     On or about October 29, 2002, Youngdahl and his attorneys attended an interview with a United States Postal Inspector and two United States Attorneys in the Southern District of New York. Indictment ¶48. Again, Youngdahl made false statements concerning Davis'

disclosure of the Treasury Department's announcement before the expiration of the embargo period on October 31, 2001. Indictment ¶48. He also falsely stated that he had never seen the emails that he and Davis exchanged on July 12, 2001. *Id.* ¶ (Specification Six).

65. On or about February 4, 2003, during testimony before the Securities Exchange Commission, Youngdahl falsely denied the existence of the agreement between Goldman and Davis whereby Davis would provide Goldman with information concerning Treasury Department announcements before the expiration of the embargo period. Indictment ¶55.

66. All of these misstatements were belied by the evidence later uncovered during these investigations.

## XI. The Results of the Government Investigations Are Revealed For The First Time In September 2003.

67. On September 3, 2003 and September 4, 2003, the United States Attorney and the Securities Exchange Commission announced the details and results of their investigations. For the first time, the federal government revealed the nature of Goldman's relationship with Davis, the conspiracy, and the fact that Goldman engaged in transactions in 30-Year Futures and CBOT-specified 30-Year Bonds before public release of the Treasury Department's announcement.

68. In particular, on September 3, 2003, the United States District Court for the Southern District of New York unsealed a seven-count Indictment charging John M. Youngdahl with insider trading, perjury, false statements and other misconduct. *See* Sept. 4, 2003 Press Release, U.S. Charges Ex-Goldman Sachs Vice President and Consultant with Insider Trading in U.S. Treasury Bonds.

69. That same day, Davis pled guilty to conspiracy to defraud the United States, theft of public property and securities fraud.

70. Also on September 3, 2003, the SEC entered into a consent decree with Goldman. The SEC expressly found that "Goldman Sachs failed to establish, maintain and enforce written policies and procedures reasonably designed to prevent the misuse of material nonpublic information potentially obtained by outside consultants." *See In re Goldman, Sachs & Co.*, Admin Proc. File No. 3-11240 (Order Instituting Administrative and Cease-and-Desist Proceedings (Sept. 4, 2003), attached as Ex. 4, at p. 2. The SEC also expressly found that Goldman "did not have procedures reasonably designed to prevent the misuse of material, nonpublic information obtained from consultants like Davis." *Id*. p. 6. "Goldman Sachs' written procedures did not expressly address circumstances in which consultants like Davis conveyed information to Goldman Sachs with the expectation that Goldman Sachs would use the information, even though the consultant obtained the information from a source that intended the information to be kept confidential." *Id*.

71. Goldman agreed to disgorge its trading profits, agreed to pay a penalty of $5,000,000.00 to the Treasury Department and agreed to adopt and implement internal controls that would prevent the misuse of information of the type that took place on October 31, 2001.

72. On September 4, 2003, the SEC filed a civil complaint against Davis and Youngdahl in the United States District Court for the Southern District of New York. Davis and the SEC entered into a consent decree enjoining Davis from further violations of the securities laws, ordering him to disgorge profits, and ordering him to pay a $120,000.00 penalty.

73. Goldman's employee, Youngdahl, did not settle the SEC charges at that time.

74. On November 12, 2003, Youngdahl pled guilty to insider trading, theft of government property, wire fraud and conspiracy. *See* Press Release, "Former Goldman Sachs Vice President and Senior Economist Pleads Guilty to Insider Trading in U.S. Treasury Bonds,"

United States Attorney Southern District of New York (Nov. 12, 2003) p. 1. Youngdahl admitted for the first time that Goldman and Davis entered into an improper agreement whereby Davis would provide Goldman with pre-embargo information. Youngdahl Plea, p. 18:3-15.

75. Youngdahl further admitted that he had made false statements to United States Attorney's investigators when he denied knowing whether Davis attended Treasury Department refunding conferences or knowing that Davis was providing him with pre-embargo information:

> On approximately August 15, 2002 and again on October 29, 2002 I was interviewed by the U.S. Attorney's Office for the Southern District of New York. During those interviews I denied when they were asking whether a consultant was present at quarterly refunding announcements or knowing the source of this information. I also denied having an understanding or expectation that the consultant would provide me embargoed information or knowing that the consultant received information concerning the refunding announcements before the expiration of the embargo directed from the Treasury. Those statements were false.

Youngdahl Plea p. 19:5-15.

76. Youngdahl also admitted for the first time that he had made false statements to SEC investigators when he denied the existence of the agreement between Goldman and Davis:

> On approximately February 4, 2003 I testified in an SEC proceeding. During that proceeding, the SEC staff asked me a series of questions about whether the consultant and I had ever had conversations about him getting embargoed information by attending the Treasury briefings. I was also asked about a series of e-mail messages dated July 12, 2001 between the consultant and me. I denied knowing that the consultant attended the Treasury briefings. I also denied ever sending or receiving e-mail messages. Those statements were untrue.

Youngdahl Plea p. 19:16-24.

77. Youngdahl admitted that at all material times he understood that his agreement with Davis was improper: "I understood that doing so was improper for both the consultant and me." Youngdahl Plea p. 18. "I understood that the information provided in those briefings was confidential and embargoed and that the information was not to be released or used by attendees

including the consultant until a time that had been specified by Treasury officials." Youngdahl Plea p. 18:4-8.

78.    Youngdahl intended to convey this information to traders at Goldman who would trade in Treasury securities and Futures based on the information. Indictment ¶12.

79.    Youngdahl was motivated to enter into the agreement in part as a result of Goldman's bonus procedure. "There was an annual bonus procedure and it was my expectation that that bonus could be enhanced by having provided timely information to the Goldman traders to their profit." Youngdahl Plea p. 20:23-21:1.

80.    However, even during his plea hearing, Youngdahl was less than forthcoming. He informed the Court, under oath, that it was Davis who suggested the idea of providing pre-embargo information: "[T]he consultant offered to provide me with this information from a Treasury briefing in advance of the expiration of the embargo and I agreed to accept this information." Youngdahl Plea p. 18:9-18:12. The evidence uncovered, however, proved just the opposite was true. It was Goldman (through Youngdahl) who specifically contacted Davis to obtain pre-embargo information and Davis who insisted that Goldman respect the embargo. (*See* ¶¶ 27-32, *supra*).

81.    On November 18, 2003, Youngdahl entered into a consent decree with the SEC enjoining him from future violations of the federal securities laws and requiring him to pay a civil penalty. Then, on April 12, 2004, Youngdahl was sentenced to 33 months of imprisonment and two years of supervised probation in connection with the criminal proceedings.

82.    On March 15, 2005, Davis was sentenced to two years of probation in connection with the criminal proceedings.

83. Goldman's denials of any wrongdoing in response to government investigations were part of an intentional attempt to dissuade government investigators from moving forward with the investigation and to deceive the public at large.

84. Plaintiffs herein support Premium Plus Partner L.P.'s efforts to bring a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure in case No. 04-1851. Nothing herein should be construed as a waiver of these Plaintiffs' right and desire to participate in that action as absent Class members (or as Class representatives if the Court deems the same to be appropriate) should that action ever receive certification as a class action.

**COUNT I**
**COMMODITY EXCHANGE ACT CLAIM**
**AGAINST GOLDMAN AND YOUNGDAHL**

85. Plaintiffs incorporate Paragraphs 1 through 83, as if fully alleged herein.

86. The CEA makes it a felony for any person "to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any contract market, or to corner or attempt to corner any such commodity." 7 U.S.C. § 13(b).

87. The CEA provides a private remedy for violations of the Act's substantive provisions. "Any person … who violates this chapter or who willfully aids, abets, counsels, induces or procures the commission of a violation of this chapter shall be liable for actual damages … to any other person" who meets certain criteria set forth in the private remedy provision. 7 U.S.C. § 25(a)(1).

88. A person who "purchased or sold" a contract for "any commodity for future delivery (or option on such contract or any commodity)" has standing to sue under the CEA any

defendant who violated the CEA through "manipulation of the price of any such contract or the price of the commodity underlying such contract." 7 U.S.C. § 25(a)(1)(B) and (D).

89.　　The CEA provides for "punitive or exemplary damages equal to no more than two times the amount of actual damages" where the defendant's violation is "willful and intentional." 7 U.S.C. § 25(a)(3)(B).

90.　　30-Year Futures and Options are "commodities" for purposes of the CEA. CBOT-specified 30-Year Bonds are the commodities underlying 30-Year Futures, and CBOT-specified 30-Year Bonds and Future are the commodities underlying 30-Year Options.

91.　　Beginning October 31, 2001, Goldman and its traders and employees, including Youngdahl, manipulated the prices of 30-Year Futures and Options by amassing an enormous long position in 30-Year Futures and CBOT-specified 30-Year Bonds prior to public release of the Treasury Department's decision to stop issuing 30-Year Bonds and retaining the long position for a significant period of time after public release of this information. Upon information and belief, Goldman's manipulative conduct continued even after public announcement of the Treasury Department's decision.

92.　　Plaintiffs suffered damages as a direct and proximate result of Defendant's manipulative conduct. In the absence of Defendants' manipulative conduct, the prices 30-Year Futures and Options would not have risen to the levels that they did on October 31, 2001. Goldman's acquisition of a large long position and its retention of this position for a significant period of time after public release of the Treasury Department's decision caused the prices of these instruments to be artificially inflated on October 31, 2001.

93. Goldman and Youngdahl acted in a willful and intentional manner. They knew their agreement with Davis and their manipulative scheme, which included that agreement, were illicit.

WHEREFORE, Plaintiffs request all actual damages, punitive damages, attorneys' fees and costs warranted under the Commodity Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to:

(A) Enter an order finding Defendants liable for violations of the Commodity Exchange Act;

(B) Award Plaintiffs actual and compensatory damages and statutory, exemplary and punitive damages in an amount authorized by law and to be determined at trial;

(C) Award Plaintiffs reasonable attorneys' fees, costs and expenses incurred in connection with this action;

(D) Grant such other and further relief as the Court may deem just and equitable.

## JURY DEMAND

Plaintiffs demand trial by jury for all issues so triable.

Respectfully Submitted,

Dated: March 11, 2009

s/ Anthony F. Fata
Jennifer W. Sprengel
Dom J. Rizzi
Anthony F. Fata
**CAFFERTY FAUCHER LLP**
30 North LaSalle Street, Suite 3200
Chicago, Illinois 60602
Phone: 312/782-4480
Email: afata@caffertyfaucher.com

Michael J. Willner
Bryan L. Clobes
**CAFFERTY FAUCHER LLP**
1717 Arch Street, Suite 3610
Philadelphia, Pennsylvania  19103
Phone: 215/864-2800

***Counsel for Plaintiffs***

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA

     -v-

JOHN YOUNGDAHL,

           Defendant.

- - - - - - - - - - - - - - - - - - x

SEALED INDICTMENT

03 Cr.

**03 CRIM.  991**

**JUDGE COTE**

## COUNT ONE

(Conspiracy to Defraud the United States,
to Convert Property of the United States, and
to Commit Securities and Wire Fraud)

The Grand Jury charges:

### Relevant Persons and Entities

1.  At all times relevant to this Indictment, JOHN YOUNGDAHL, the defendant, was employed as a Vice President and Senior Economist in the Global Economics Group at Goldman, Sachs & Co., Inc. ("Goldman"), a broker-dealer with offices at 85 Broad Street, New York, New York.

2.  At all times relevant to this Indictment, Peter J. Davis, Jr., a co-conspirator not named as a defendant herein, was a political consultant and the President of Davis Capital Investment Ideas ("Davis Capital"), a sole proprietorship with offices in the District of Columbia. Prior to forming Davis Capital, Davis held various positions in the United States Government, including serving as an economist with the Joint Committee on Taxation and the Senate Budget Committee.

3.    The United States Department of the Treasury
Department (the "Treasury Department") is a department within the
executive branch of the United States Government.  The Treasury
Department is composed of various divisions that are responsible
for, among other things, federal debt finance and debt
management, the development of economic policy, and the
implementation and enforcement of the internal revenue laws.  The
Treasury Department periodically auctions debt obligations issued
by the United States ("Treasury Securities") to the public.
Treasury Securities trade on the over-the-counter market.

## Goldman, Treasury Securities Trading, and Davis Capital

4.    As part of its business, Goldman regularly trades
in Treasury Securities and futures contracts for Treasury
Securities ("Treasury Futures") for its own accounts and for the
accounts of Goldman's clients.  Much of Goldman's trading in
Treasury Securities and Treasury Futures is conducted by
Goldman's Interest Rates Products Department (the "IRP
Department") in New York, New York.  Goldman's IRP Department is
divided into three areas: (1) the United States Government
Securities Trading Desk (the "Treasury Desk"); (2) the Interest
Rate Swaps Desk (the "Swaps Desk"); and (3) the U.S. Agencies
Desk (the "Agency Desk").  At all times relevant to this
Indictment, YOUNGDAHL sat on the Treasury Desk at Goldman's
offices in New York, New York and provided the Treasury Desk with

2

advice on economic and other matters which affected the market
for Treasury Securities, including policies of the Treasury
Department.

5. At all times relevant to this Indictment, Davis
Capital provided consulting services to its clients, which
included investment banking firms, hedge funds, and research
firms, for a monthly fee. The consulting services provided by
Davis Capital related primarily to legislative developments and
government economic policy. Davis Capital regularly distributed
to its clients e-mails and newsletters which contained
information and analysis concerning these subjects.

6. Beginning in or about the Spring of 2001, Goldman
became a client of Davis Capital. YOUNGDAHL was the primary
contact for Peter J. Davis, Jr. at Goldman. YOUNGDAHL and Davis
communicated regularly by telephone and e-mail.

**The Quarterly Refunding Press Conferences and the Embargo**

7. At all times relevant to this Indictment, the
Treasury Department made public announcements on a quarterly
basis ("quarterly refunding announcements") concerning the debt
financing requirements of the United States Government, the types
of Treasury Securities that would be auctioned to the public in
the coming quarter, and any changes in debt finance policy.
During calendar year 2001, quarterly refunding announcements were
held on January 31 (the "January refunding announcement"), May 2

3

(the "May refunding announcement"), August 1 (the "August refunding announcement"), and October 31 (the "October refunding announcement"). Traders of stocks and bonds typically rely on of quarterly refunding announcements in formulating trading strategies, including decisions about whether to buy or sell Treasury Securities and Treasury Futures.

8. The quarterly refunding announcements were made in writing and posted on the Treasury Department's website. At all times relevant to this Indictment, in advance of each quarterly refunding announcement, the Treasury Department held a press conference ("quarterly refunding press conference") at its offices at 1500 Pennsylvania Avenue, Washington, D.C.

9. At all times relevant to this Indictment, prior authorization from the Treasury Department was required to attend the quarterly refunding press conference, and all attendees were required, in advance, to abide by an embargo imposed upon the information conveyed to them during the press conference. Under the embargo, all those who attended the quarterly refunding press conference assumed a contractual duty of trust and confidence with respect to the Treasury Department and were required to treat the information they received at the press conference as confidential and non-public until the embargo was lifted. Attendees were not permitted to disseminate the embargoed information to third parties. The embargo system was imposed by

4

the Treasury Department to ensure that its quarterly refunding announcements were understood by the press and accurately conveyed to the public at large in a uniform, simultaneous fashion.

10.    Beginning in or about 1994, Davis began attending the Treasury Department's quarterly refunding press conferences. At all relevant times, Davis understood that any information conveyed to him at those press conferences was embargoed, to be treated as confidential and non-public, and was not to be disseminated to any third party until the Treasury Department lifted the embargo. Davis agreed to abide by the terms of the embargo and not to disseminate the information to third parties.

11.    Between at least in or about 1999 up to and including on or about October 31, 2001, Davis violated the embargo imposed by the Treasury Department. Davis misappropriated, converted and stole confidential, non-public information that he obtained during quarterly refunding press conferences by conveying that information to clients of Davis Capital, including, among others, YOUNGDAHL, before the expiration of the embargo.

## The Scheme to Defraud

12.    Between on or about July 12, 2001 and on or about October 31, 2001, YOUNGDAHL and Davis agreed that Davis would misappropriate, convert and steal confidential, material, non-

5

public information obtained at quarterly refunding press conferences and convey it to YOUNGDAHL before the embargo was lifted. YOUNGDAHL, as Davis well knew, intended to and did use and convey that information to traders at Goldman who would trade in Treasury Securities and futures while in possession of that information. Davis, for his part, hoped and intended by this agreement to further his consulting arrangement with Goldman.

13. On or about July 12, 2001, at approximately 1:18 p.m., YOUNGDAHL sent an e-mail from his computer at Goldman's offices in New York to Davis. In that e-mail, YOUNGDAHL acknowledged that Davis had provided YOUNGDAHL with information relating to the May refunding announcement before it had been made public by the Treasury Department. In that e-mail, YOUNGDAHL also asked Davis if Davis could give such information to YOUNGDAHL in advance of the quarterly refunding announcements as "a routine matter" beginning with the August refunding announcement. The e-mail stated as follows:

> Subject:
>
> From: "Youngdahl, John" <john.youngdahl@gs.com>
>
> Date: 7/12/01 1:18 p.m.
>
> To: 'pete@daviscap.com'<pete@daviscap.com>
>
> Last quarter you called me on the morning of the Treasury refunding press conference, to give me details from the briefing just before they hit the tape. Were you in the press room that morning for the briefing, or did you get the info from somewhere else? Is

6

this something that we can arrange as a
routine matter (the next occasion will be Aug
1 AM)?

14. On or about July 12, 2001, at approximately 2:15
p.m., Davis sent a reply e-mail to YOUNGDAHL at YOUNGDAHL's
computer at Goldman. In that e-mail, Davis stated that he
attends the quarterly refunding press conferences and could call
YOUNGDAHL before the embargo time. The e-mail stated as follows:

> Subject: Re:
>
> From: Pete Davis <pete@daviscap.com>
>
> Date: 7/12/2001 2:15 p.m.
>
> To: "Youngdahl, John" <john.youngdahl@gs.com>
>
> I attend the quarterly briefings and can call
> a few minutes before with the understanding
> that everything is embargoed until the
> embargo time.

15. On or about July 12, 2001, at approximately 2:22
p.m., YOUNGDAHL sent a reply e-mail to Davis from YOUNGDAHL's
computer at Goldman, stating that YOUNGDAHL and Davis should
discuss the matter "to be sure the ground rules are clear in
advance." The e-mail, which also attached a copy of Davis'
previous e-mail message discussed in paragraph 14 above, stated:

> Subject: Re:
>
> From: "Youngdahl, John" <john.youngdahl@gs.com>
>
> Date: 7/12/01 2:22 p.m.
>
> To: 'Pete Davis'<pete@daviscap.com>
>
> We should chat about this just to be sure the

7

ground rules are clear in advance[.]

16. Sometime after the exchange of e-mails on or about July 12, 2001, YOUNGDAHL and Davis had a telephone conversation in which YOUNGDAHL asked Davis, and Davis agreed, to convey to YOUNGDAHL embargoed, confidential, non-public information that Davis would misappropriate, convert and steal from the United States at the quarterly refunding press conferences in advance of the public release of the quarterly refunding announcements.

## The August 1 Refunding Press Conference

17. On or about August 1, 2001, at approximately 9:35 a.m., the Treasury Department made public a quarterly refunding announcement stating, among other things, that it would auction (a) approximately $11 billion worth of 5-Year Treasury Notes that had been originally issued in May of 2001; (b) $11 billion worth of new 10-Year Treasury Notes maturing on August 15, 2011; and (c) approximately $5 billion worth of 30-Year Treasury Bonds that had been originally issued in February of 2001. At approximately 9:00 a.m., shortly before the public announcement, the Treasury Department held a quarterly refunding press conference at its offices at 1500 Pennsylvania Avenue, Washington, D.C. Davis attended that press conference.

18. At the quarterly refunding press conference, a representative from the Treasury Department announced that the information being distributed would be subject to an embargo.

8

Representatives of the Treasury Department then distributed copies of a prepared statement by the Assistant Secretary for Financial Markets to the audience. The Undersecretary for Domestic Finance read from the prepared statement and answered several questions from the audience. The quarterly refunding press conference ended shortly after 9:15 a.m. At the conclusion of the press conference, a representative from the Treasury Department again stated that the information was embargoed until approximately 9:35 a.m.

19. At the conclusion of the quarterly refunding press conference, Davis left the Treasury Department. Between approximately 9:19 a.m. and 9:33 a.m., in violation of the terms of the embargo and his duty of trust and confidence to the Treasury Department, Davis made a series of telephone calls to certain current and prospective clients of Davis Capital, in which he related, in substance, that the Department of the Treasury would be auctioning (a) approximately $11 billion worth of 5-Year Treasury Notes that had been originally issued in May of 2001; (b) $11 billion worth of new 10-Year Treasury Notes maturing on August 15, 2011; and (c) approximately $5 billion worth of 30-Year Treasury Bonds that had been originally issued in February of 2001. Davis also informed those current and prospective clients that the information was embargoed until approximately 9:35 a.m. Among the clients that Davis called

9

during this period was YOUNGDAHL.

20. At approximately 9:27 a.m., Davis called YOUNGDAHL at Goldman in New York, New York and conveyed the embargoed information to YOUNGDAHL, pursuant to their agreement, and told him that the information was embargoed until approximately 9:35 a.m. Davis and YOUNGDAHL knew that this information was confidential, material, and non-public, and had been misappropriated, converted and stolen by Davis from the Treasury Department in breach of Davis' duties to keep such information confidential until the 9:35 a.m. embargo time.

## The October 31 Refunding Press Conference

21. On or about October 31, 2001, the Treasury Department made a quarterly refunding announcement stating, among other things, that the Treasury Department was suspending issuance of 30-Year Treasury Bonds. On the previous day, the Treasury Department set a 10:00 a.m. embargo time for the release of the announcement.

22. Prior to the suspension, the 30-Year Bond was the longest-term Treasury Security and was a significant benchmark for interest rates on various financial instruments, including publicly traded financial instruments. The decision to suspend the 30-Year Bond was not anticipated by many economists who followed the bond market, including YOUNGDAHL.

23. At approximately 9:00 a.m., shortly before the

10

public announcement, the Treasury Department held a quarterly
refunding press conference at its offices at 1500 Pennsylvania
Avenue, Washington, D.C. Davis attended that press conference.

24. At the beginning of the quarterly refunding press
conference, a representative from the Treasury Department
announced that the information being distributed would be
embargoed until 10:00 a.m. Representatives of the Treasury
Department then distributed copies of a prepared statement by the
Undersecretary for Domestic Finance to the audience. The
Undersecretary for Domestic Finance read from the prepared
statement and then answered several questions from the audience.
At the conclusion of the quarterly refunding press conference, a
representative from the Treasury Department again announced that
the information was embargoed until 10:00 a.m. The quarterly
refunding press conference ended shortly before 9:30 a.m.

25. At the conclusion of the quarterly refunding press
conference, Davis left the Treasury Department. Between
approximately 9:28 a.m. and 9:58 a.m., in violation of the terms
of the embargo and his duty of trust and confidence to the
Treasury Department, Davis made a series of telephone calls to
certain current and prospective clients of Davis Capital, in
which he stated, in substance, that the Treasury Department was
suspending issuance of 30-Year Treasury Bonds and that this
information was embargoed until 10:00 a.m.

11

26. Among the clients that Davis called during this period was YOUNGDAHL. At approximately 9:35 a.m., Davis called YOUNGDAHL at Goldman in New York and, pursuant to their agreement, Davis conveyed the embargoed information, namely that the Treasury Department was suspending issuance of 30-Year Treasury Bonds, and Davis told him that this information was embargoed until 10:00 a.m. Davis and YOUNGDAHL knew that this information was confidential, material, and non-public, and had been misappropriated, converted and stolen by Davis from the Treasury Department in breach of Davis' duties to keep such information confidential until the 10:00 a.m. embargo time. YOUNGDAHL understood that the price of 30-Year Treasury Bonds and 30-Year Bond futures contracts would increase substantially as a result of the release of this information to the public.

27. At approximately 9:43 a.m., an employee at the Treasury Department inadvertently posted a copy of the quarterly refunding announcement concerning the suspension of the 30-Year Bond on the Department's website in advance of the planned 10:00 a.m. release time.

### Goldman's Trading Before 9:43 a.m. While in Possession Of the Embargoed Information Conveyed by Davis

28. After receiving the embargoed confidential, material, non-public information from Davis that the Treasury Department was suspending issuance of the 30-Year Bond, YOUNGDAHL disclosed that information to traders at Goldman (collectively

12

the "Traders"). Between 9:35 a.m. and 9:43 a.m., while in
possession of this information, the Traders caused Goldman to
purchase approximately $84 million worth of 30-Year Bonds and
approximately $233.6 million worth of 30-Year Bond futures
contracts for Goldman's proprietary account. As a result of
these trades, Goldman earned at least approximately $1.5 million
dollars in illegal profits from the subsequent sale of these 30-
Year Bonds and at least approximately $2.3 million dollars in
illegal profits from the subsequent sale of 30-Year Bond futures
contracts.

29. The news of the suspension of the 30-Year Bond
triggered one of the biggest single-day rallies in the history of
the United States bond market. Treasury bonds are priced as a
percentage of their par value and are typically quoted as a
percent of par to the nearest 1/32nd of one percent. The minimum
denomination of a Treasury bond is $1,000. At approximately 9:35
a.m., the price of the 30-Year Bond stood at approximately 102-
21. At approximately 9:44 a.m., one minute after an employee at
the Treasury Department inadvertently posted the news of the
suspension of the 30-Year Bond on the Department's website, the
price of the 30-Year Bond rose to approximately 102-23.
Thereafter, the 30-Year Bond rose steadily in price to
approximately 102-25 at 9:48 a.m., and to approximately 103-12 at
9:57 a.m. At approximately 9:59 a.m., the 30-Year Bond rose to

13

approximately 104 and continued to rise thereafter reaching an
intra-day high of approximately 108-17, before finally closing at
approximately 107-24, a gain of more than five percent from the
previous day's closing price.

<u>The Conspiracy</u>

30. From on or about July 12, 2001, up to and
including on or about October 31, 2001, in the Southern District
of New York and elsewhere, JOHN YOUNGDAHL, the defendant, and
Peter J. Davis, Jr., together with others known and unknown,
unlawfully, willfully, and knowingly did combine, conspire,
confederate and agree, together and with each other, to defraud
the United States and to commit offenses against the United
States, to wit, to defraud the United States and the Treasury
Department (in violation of Title 18, United States Code, Section
371), to convert property of the United States and the Treasury
Department (in violation of Title 18, United States Code, Section
641), to commit securities fraud (in violation of Title 15,
United States Code, Sections 78j(b) and 78ff, and Title 17, Code
of Federal Regulations, Sections 240.10b-5, 240.10b-5-1, and
240.10b-5-2), and to commit wire fraud (in violation of Title 18,
United States Code, Section 1343).

<u>Objects Of The Conspiracy</u>

<u>Defraud the United States and
the Treasury Department</u>

31. It was a part and an object of the conspiracy that

14

YOUNGDAHL and Davis, together with others known and unknown,
unlawfully, willfully, and knowingly would and did defraud the
United States and an agency thereof in violation of Title 18,
United States Code, Section 371.

### Conversion of Property of the United States and the Treasury Department

32.   It was a further part and an object of the
conspiracy that YOUNGDAHL and Davis, together with others known
and unknown, unlawfully, willfully, and knowingly would and did
receive, conceal, and retain things of value of the United States
and departments and agencies thereof with a value greater than
$1,000, with intent to convert it to their own use and gain,
knowing it to have been stolen, purloined and converted, in
violation of Title 18, United States Code, Section 641.

### Securities Fraud

33.   It was a further part and an object of the
conspiracy that YOUNGDAHL and Davis, together with others known
and unknown, unlawfully, willfully and knowingly, directly and
indirectly, by use of the means and instrumentalities of
interstate commerce, the mails and the facilities of national
securities exchanges, did use and employ, in connection with the
purchase and sale of securities, manipulative and deceptive
devices and contrivances, in violation of Title 15, Code of
Federal Regulations, Sections 240.10b-5, 240.10b-5-1, and
240.10b-5-2, by (a) employing devices, schemes and artifices to

15

defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would and did operate as a fraud and deceit upon purchasers and sellers of Treasury Securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5, 240.10b-5-1, and 240.10b-5-2.

## Wire Fraud

34. It was further a part and an object of the conspiracy that YOUNGDAHL and Davis, together with others known and unknown, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

## Means and Methods of the Conspiracy

35. Among the means and methods by which, YOUNGDAHL and Davis, and others known and unknown, would and did carry out

16

the conspiracy were the following:

a. Davis gained admission to quarterly refunding press conferences through false pretenses and promises. Specifically, to gain admission, Davis agreed to receive embargoed, confidential, material, non-public information of the United States and the Treasury Department at various quarterly refunding press conferences on the express condition that Davis not disclose such information to any third party until the embargoes were lifted. In truth and in fact, Davis had no intention of honoring the embargoes and was planning to and did convey such information to YOUNGDAHL and others before the embargoes were lifted.

b. In order to plan and implement their scheme to defraud the United States, the Treasury Department, and purchasers and sellers of Treasury Securities and Treasury Futures, YOUNGDAHL and Davis made interstate telephone calls and sent interstate communications by e-mail between New York and Washington, D.C.

c. In order to profit from the embargoed, confidential, material, non-public information that Davis had stolen and conveyed to him, YOUNGDAHL disclosed that information to the Traders at Goldman with the intent and expectation that before the embargo was lifted, the Traders, while in possession of that information, would purchase large positions of Treasury

17

Securities and futures contracts for Treasury Securities, which would be subsequently sold for substantial illegal profits.

## Overt Acts

36. In furtherance of the conspiracy and to effect the unlawful objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about July 12, 2001, YOUNGDAHL sent an e-mail from his computer at Goldman's offices in New York, New York to Davis in Washington, D.C.

b. On or about July 12, 2001, Davis sent an e-mail from his computer in Washington, D.C. to YOUNGDAHL in New York, New York.

c. On or about July 12, 2001, YOUNGDAHL sent an e-mail from his computer at Goldman's offices in New York, New York to Davis in Washington, D.C.

d. On or about August 1, 2001, Davis placed a cellular telephone call from Washington, D.C. to YOUNGDAHL at Goldman's offices in New York, New York.

e. On or about October 31, 2001, Davis placed a cellular telephone call from Washington, D.C. to YOUNGDAHL at Goldman's offices in New York, New York.

f. On or about October 31, 2001, YOUNGDAHL made statements to the Traders at Goldman.

18

(Title 18, United States Code, Section 371).

## COUNT TWO

(Conversion of Property of the United States)

The Grand Jury further charges:

37. The allegations set forth in paragraphs 1 though 29, 35 and 36 are repeated and realleged as if set forth fully herein.

38. From at least on or about August 1, 2001, up to and including on or about October 31, 2001, in the Southern District of New York and elsewhere, JOHN YOUNGDAHL, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did receive, conceal, and retain things of value of the United States and departments and agencies thereof with a value greater than $1,000, namely the embargoed, confidential, non-public information set forth above, with intent to convert it to his own use and gain, knowing it to have been stolen, purloined and converted, in violation of Title 18, United States Code, Section 641.

(Title 18, United States Code, Section 641).

## COUNT THREE

(Securities Fraud)

The Grand Jury further charges:

39. The allegations set forth in paragraphs 1 though

19

29, 35 and 36 are repeated and realleged as if set forth fully herein.

    40. Between on or about July 12, 2001 and on or about October 31, 2001, in the Southern District of New York and elsewhere, JOHN YOUNGDAHL, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and of the mails, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Sections 240.10b-5, 240.10b-5-1, and 240.10b-5-2, by (a) employing devices, schemes, and artifices to defraud, (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in connection with the purchase and sale of 30-Year Treasury Bonds and 30-Year Bond futures contracts.

        (Title 15, United States Code, Sections 78j(b),
        78ff; Title 17, Code of Federal Regulations,
        Sections 240.10b-5, 240.10b-5-1, 240.10b-5-2;
        Title 18, United States Code, Section 2).

## COUNT FOUR

### (Wire Fraud)

The Grand Jury further charges:

41. The allegations set forth in paragraphs 1 though 29, 35 and 36 are repeated and realleged as if set forth fully herein.

42. On or about October 31, 2001, in the Southern District of New York and elsewhere, JOHN YOUNGDAHL, the defendant, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, unlawfully, willfully and knowingly would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, YOUNGDAHL in New York, New York spoke by telephone with Peter Davis in Washington, D.C.

(Title 18, United States Code, Sections 1343 and 2).

## COUNT FIVE

### (False Statements)

The Grand Jury further charges:

43. The allegations set forth in paragraphs 1 though 29, 35 and 36 are repeated and realleged as if set forth fully herein.

21

44. In or about November of 2001, the United States Attorney's Office for the Southern District of New York commenced an investigation into the misappropriation of embargoed, confidential, non-public information of the Treasury Department on October 31, 2001, and possible violations of the federal securities laws against insider trading and other federal laws.

45. On or about August 15, 2002, YOUNGDAHL and his attorneys attended a voluntary interview with a Criminal Investigator and an Assistant United States Attorney at the United States Attorney's Office for the Southern District of New York. During the course of the interview, YOUNGDAHL made false statements and concealed material facts concerning Davis' disclosure of the Treasury Department's decision to suspend issuance of the 30-Year Bond on October 31, 2001 before the 10:00 a.m. embargo was lifted.

### Statutory Allegation

46. On or about August 15, 2002, in the Southern District of New York, JOHN YOUNGDAHL, the defendant, unlawfully, willfully, and knowingly, in a matter within the jurisdiction of the executive branch of the Government of the United States, falsified, concealed, and covered up by trick, scheme, and device material facts, and made materially false, fictitious, and fraudulent statements and representations:

22

### Specification One

YOUNGDAHL falsely stated that he had no discussions with Davis about receiving embargoed information from the Treasury Department.

### Specification Two

YOUNGDAHL falsely stated that he had no understanding or agreement with Davis that he would call on the morning of October 31 before the October refunding announcement and provide YOUNGDAHL with embargoed information from the Treasury Department.

(Title 18, United States Code, Section 1001(a)(1)).

### COUNT SIX

#### (False Statements)

The Grand Jury further charges:

47.   The allegations set forth in paragraphs 1 though 29, 35, 36, 44, and 45 are repeated and realleged as if set forth fully herein.

48.   On or about October 29, 2002, YOUNGDAHL and his attorneys attended a voluntary interview with a United States Postal Inspector and two Assistant United States Attorneys at the United States Attorney's Office for the Southern District of New York.  During the course of the interview, YOUNGDAHL made false statements and concealed material facts concerning Davis' disclosure of the Treasury Department's decision to suspend

23

issuance of the 30-Year Bond on October 31, 2001 before the 10:00 a.m. embargo.

## Statutory Allegation

49.   On or about October 29, 2002, in the Southern District of New York, JOHN YOUNGDAHL, the defendant, unlawfully, willfully, and knowingly, in a matter within the jurisdiction of the executive branch of the Government of the United States, falsified, concealed, and covered up by trick, scheme, and device material facts, and made materially false, fictitious, and fraudulent statements and representations:

## Specification One

YOUNGDAHL falsely stated that although he had received information from Davis relating to the May refunding announcement before the time the announcement was made public, YOUNGDAHL never asked Davis if Davis was present at the quarterly refunding press conference (which was held before the May refunding announcement) and never asked Davis about the source of his information.

## Specification Two

YOUNGDAHL falsely stated that he had no understanding or expectation that Davis would provide him with embargoed confidential, non-public information of the Treasury Department relating to the August refunding announcement before the public release of the information.

24

### Specification Three

YOUNGDAHL falsely stated that he had no idea where Davis received the information that Davis provided to YOUNGDAHL shortly before the May and August refunding announcements.

### Specification Four

YOUNGDAHL falsely stated that he did not understand that Davis had received the information concerning the May and August refunding announcements before their public release directly from the Treasury Department.

### Specification Five

YOUNGDAHL falsely stated that Davis never mentioned a Treasury Department embargo during any of Davis' telephone conversations with YOUNGDAHL on the dates of the May, August, and October refunding announcements.

### Specification Six

When shown copies of the three e-mail messages between himself and Davis on July 12, 2001, which are discussed in paragraphs 13, 14, and 15 above, YOUNGDAHL falsely stated that he could not recall seeing these e-mail messages.

(Title 18, United States Code, Section 1001(a)(1)).

### COUNT SEVEN

(Perjury)

The Grand Jury further charges:

50. The allegations set forth in paragraphs 1 though

25

29, 35, 36, 44, 45, and 48 are repeated and realleged as if set forth fully herein.

51. On or about November 7, 2001, the United States Securities and Exchange Commission (the "SEC") issued a formal administrative order, entitled "Order Directing Private Investigation And Designating Officers To Take Testimony," which authorized the SEC's staff, among other things, to issue subpoenas, administer oaths, and compel testimony of witnesses, in the SEC's investigation of possible violations of the federal securities laws in connection with trading in Treasury Securities on October 31, 2001, prior to the public release of the October refunding announcement.

52. On or about November 8, 2001, the SEC's staff issued a subpoena to YOUNGDAHL compelling him to provide sworn testimony before the SEC staff.

53. Pursuant to the subpoena, YOUNGDAHL appeared at the offices of the SEC in Washington, D.C. with one of his attorneys on or about November 13, 2001. A member of the SEC staff administered an oath to YOUNGDAHL whereby YOUNGDAHL agreed to provide truthful testimony to questions posed by the SEC staff.

54. On or about February 4, 2003, YOUNGDAHL's testimony was reconvened at the SEC's offices in New York, New York. YOUNGDAHL appeared with two attorneys and was advised at

26

the outset of the proceeding that he was still under oath and obligated to testify truthfully. As set forth below, YOUNGDAHL testified falsely about matters that were material to the SEC's investigation.

### Statutory Allegation

55. On or about February 4, 2003, in the Southern District of New York, JOHN YOUNGDAHL, the defendant, having taken an oath before a competent tribunal, officer, and person, in a case in which the law of the United States authorizes an oath to be administered, namely, in testimony before an officer of the SEC, that he would testify, declare, depose and certify truly, and that any written testimony, declaration, deposition and certificate by him subscribed, would be true, unlawfully, willfully, knowingly, and contrary to such oath, stated and subscribed material matters which he did not believe to be true, namely, the testimony on or about February 4, 2003, the underlined portions of which he believed to be materially false:

### Specification One

(Page 74, Line 1 - Page 75, Line 7)

Q: Mr. YOUNGDAHL, let me ask you, did you ever have conversations with Pete Davis about him attending any U.S. Treasury press conferences?

A: No.

Q: Did you have any conversations with him about him attending quarterly Treasury press conferences?

A: No.

27

Q: Did you have any communications with Peter Davis about him getting any information about U.S. Treasury securities by attending U.S. Treasury press conferences?

A: <u>No.</u>

Q: Did you have any communications with Peter Davis about him attending any U.S. Treasury refunding announcements?

A: <u>No.</u>

Q: Did you have any communications with Peter Davis about him getting any information about the U.S. Treasury securities by attending U.S. Treasury quarterly refunding press conferences?

A: <u>No.</u>

Q: Did you have any communications with Peter Davis about U.S. Treasury embargo information?

A: <u>No.</u>

Q: Did you have any - by that I mean did you have conversations with them [sic] about the fact that any information he was getting from the Treasury Department was embargoed information?

A: <u>No, I did not.</u>

Q: Did you have any communications with Peter Davis about him getting embargoed information from the U.S. Treasury?

A: <u>No.</u>

## Specification Two

(Page 75, Line 8 - Page 77, Line 13)

Q: Mr. YOUNGDAHL, let me show you what's been previously marked as Exhibit No. 40. Exhibit 40 is a series of e-mails, according to these e-mails they're between you - e-mail conversations or e-mail messages between you and Peter Davis dated July 12, 2001 and there's two messages here - three messages here on two pages. Let

28

me direct your attention to the first e-mail here, it's
July 2, [sic] 2001, at 13:18:33 hours from John
Youngdahl@GS.com to Peter Davis at Pete@DavisCap.com
Have you read that e-mail?

A:   This is not an e-mail.

Q:   Have you read this?

A:   I've read this document.

Q:   Have you seen this document before?

A:   I have.

Q:   Where have you seen this document?

A:   It was presented to me by the U.S. Attorney's office.

         *     *     *     *     *

Q:   Was that the first time you had seen this?

A:   It was.

Q:   Was this an e-mail message between you and Peter Davis?

A:   No.

Q:   Did you ever send an e-mail message to Peter Davis in
     which you stated "Last quarter you called me on the
     morning of the Treasury refunding press conference to
     give me details from the briefing just before they hit
     the tape.  Were you in the press room that morning for
     the briefing or did you get the information from
     elsewhere?  Is there [sic] something we can arrange as
     a routine matter (the next occasion will be August 1
     a.m.)?"  Did you ever send that e-mail message to Peter
     Davis?

A:   No, never.

Q:   You referred earlier that this was not an e-mail
     message, why did you say that?

A:   Because I never sent an e-mail like this, never.

29

Q:    Are there any reasons why you don't believe that this
      was an e-mail message?

A:    <u>That is the reason, I never sent an e-mail like this
      ever.</u>

Q:    How can you be so certain of that?

A:    <u>Because I never did.  I never did and I never would.</u>

Q:    You testified earlier that there were certain e-mails
      that you looked at, that they appeared to be e-mails
      that you sent out or you weren't sure.  There were
      certain e-mails that you received and you're not sure
      if you received them or you read them or not.  How can
      you be so sure about this e-mail or this document as
      opposed to the others?

A:    <u>Because I never had any discussion with Peter Davis
      about this subject matter ever, of any kind.</u>

### Specification Three

        (Page 78, line 19 - Page 79, line 25)

Q:    Did you ever have communications with Peter Davis in
      which he told you that he received Treasury refunding
      information while in the U.S. Treasury press room?

A:    <u>No.</u>

            *     *     *     *     *

Q:    Okay.  Did you ever have communications with Pete Davis
      in which you asked him if he received U.S. Treasury
      refunding information from somewhere other than the
      U.S. Treasury press room?

A:    <u>I don't recall ever having any conversations about that
      subject with him.</u>

            *     *     *     *     *

Q:    Did you ever have communications with Peter Davis in
      which he told you that he received Treasury refunding
      information from somewhere other than the U.S. Treasury
      press room?

                            30

A: <u>I don't remember.</u>

Q: Did you ever have communications with Peter Davis in which you asked him if he could arrange to provide you with Treasury refunding information on a routine basis?

A: <u>No.</u>

Q: Did you ever have communications with Peter Davis in which he told you that he would provide you with Treasury refunding information on a routine basis?

A: <u>No.</u>

### Specification Four

(Page 82, line 13 - Page 84, line 10)

Q: Mr. YOUNGDAHL, let me have you turn the page there, there's two messages there, I want to go to the one that says original message, it was sent July 12, 2001, it's dated 2:16 p.m. from Peter Davis to JOHN YOUNGDAHL.

\*    \*    \*    \*    \*

The one on the bottom of the page, and it says "I attend the quarterly briefings and can call a few minutes before with the understanding that everything is embargoed until the embargo time." Did you ever receive an e-mail message from Peter Davis in which he made that statement to you?

A: <u>Never, no.</u>

\*    \*    \*    \*    \*

Q: Did you ever have communications with Peter Davis in which he told you that he attended the U.S. Treasury quarterly refunding meetings?

A: <u>No.</u>

Q: Did you have communications with Peter Davis in which you asked him if he attended the U.S. Treasury quarterly refunding press conferences?

A: <u>No, never.</u>

Q:   Did you have any communications with Peter Davis in
     which he told you that he could call you with the
     Treasury refunding information minutes before the U.S.
     Treasury embargo was lifted?

A:   No.

Q:   Did you have any communications with Peter Davis in
     which you asked him if he could call you with the
     Treasury refunding information minutes before the U.S.
     Treasury embargo was lifted?

A:   No, never.

Q:   Did you have any communications with Peter Davis in
     which he told you he would provide you with Treasury
     refunding information with the understanding that such
     information is subject to an embargo?

A:   No.

Q:   Did you have any communications with Peter Davis in
     which you asked him if he would provide you with the
     Treasury refunding information with the understanding
     that such information is subject to an embargo?

A:   No.

Q:   Did you have any communications with Peter Davis in
     which there was an agreement that he would provide you
     with embargoed U.S. Treasury refunding information with
     the understanding you would observe the embargo?

A:   No.

## Specification Five

(Page 88, line 19 - Page 89, line 15)

Q:   And then lastly I'm going to have you look at the e-
     mail message or the message with the date and time of
     July 12, 2001 at 14:22:17 hours from JOHN YOUNGDAHL to
     Pete Davis and the message states "We should chat about
     this just to be sure the ground rules are clear in
     advance." Did you ever send an e-mail message to Peter
     Davis in which you said "we should chat about this just
     to be sure the ground rules are clear in advance"?

32

A:   No, absolutely not.

Q:   How were you certain about that?

A:   Because I would certainly remember that and I do not remember that.

Q:   Did you have any discussions with Peter Davis in which you discussed ground rules for him to provide you with U.S. Treasury refunding information on the morning of the Treasury's quarterly refunding announcements?

A:   No.

Q:   Did you have any communications with Peter Davis in which he discussed ground rules under which he would provide you with U.S. Treasury refunding information on the morning of the Treasury's quarterly refunding announcements?

A:   No.

(Title 18, United States Code, Section 1621).


FOREPERSON

JAMES B. COMEY
United States Attorney


33

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

### JOHN YOUNGDAHL,

**Defendant.**

## INDICTMENT

(18 U.S.C. §§ 371, 641, 1343, 2, 1001, 1621;
15 U.S.C. §§ 78j(b), 78ff)

_____ JAMES B. COMEY
United States Attorney.

**A TRUE BILL**

_Janne Y. Johnson_
_____ Foreperson.

# EXHIBIT 2

1

393fdavp                              SEALED

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                           03 CR

5    PETER J. DAVIS, JR.

6                   Defendant.

7    ------------------------------x

8
                                            September 3, 2003
9                                           12:40 p.m.

10
     Before:
11
                   HON. DOUGLAS F. EATON,
12
                                     Magistrate Judge
13

14                      APPEARANCES

15   JAMES B. COMEY
          United States Attorney for the
16        Southern District of New York
     BY:  ROBERT H. HOTZ, JR. and BRIAN D. COAD
17        Assistant United States Attorneys

18   BAKER BOTTS
          Attorneys for Defendant Davis
19   MARY C. SPEARING and MARK STANCIL

20

21

22

23

24

25

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

18

393fdavp                    SEALED

1    e-mail logs of Goldman Sachs.  I think that is the basis of the

2    government's evidence.

3            THE COURT:  All right.  Mr. Davis, at this point I

4    want you to tell me in your own words what did you that leads

5    to you believe that you are guilty of these three charges.

6            MS. SPEARING:  Your Honor, Mr. Davis has a prepared

7    statement he would like to read to the Court.

8            THE COURT:  That's fine.

9            MS. SPEARING:  And I would request that, given the

10   circumstances surrounding this plea, that the minutes of this

11   proceeding be sealed.

12           THE COURT:  I will grant that request.

13           MS. SPEARING:  Thank you, your Honor.

14           THE COURT:  It will be sealed and available to the

15   attorneys for Mr. Davis and the attorneys for to government.

16           MS. SPEARING:  Your Honor, also, I should have said

17   this earlier, but I am a member of the New York bar but not a

18   member of the Southern District, and have not been admitted to

19   the Southern District, and so I would move to be admitted pro

20   haec vice for the purposes of this plea.

21           THE COURT:  I grant that motion.

22           MS. SPEARING:  Thank you.

23           THE DEFENDANT:  Your Honor, since November 1992 I have

24   worked as a Washington, D.C. based economic policy consultant.

25   I advise clients, including hedge funds, banks and research

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SECNOTH00145746

Case: 1:09-cv-01543 Document #: 1 Filed: 03/11/09 Page 63 of 108 PageID #:63
Case: 1:09-cv-09835-NMG Document #: 74-33-2 Filed: 03/03/02/2006 Page 31 of 122

19

393fdavp                    SEALED

1   firms on federal policy development that will affect their

2   investments.  Beginning in the mid 1990's, I began following

3   the Treasury Department's quarterly refunding press conferences

4   for some clients, at which treasury officials would announce

5   the amounts and maturities of various debt issuances.  I

6   eventually obtained direct access to and personally attended

7   these press conferences.  My attendance was pursuant to my

8   agreement with the Treasury Department that I would abide by

9   the embargo and keep all information disseminated there

10  confidential until the embargo expired.

11          The information disseminated in the press conference

12  was embargoed by Treasury officials, such that it could not be

13  published or divulged before a specific time shortly after the

14  press conference concluded.  In 1999, in response to a request

15  from a client who ran a bond research firm but who did not

16  otherwise have direct access to the information in advance of

17  the embargo, I began relaying information to him by telephone

18  as soon as the press conference concluded so, his analyses

19  could come out at the same time as other reporters.  On some

20  occasions those calls occurred in advance of the embargo time.

21          Later in 1999, I began calling other clients I thought

22  might have an interest in the information distributed at the

23  press conferences.  At the time I was making pre-embargo calls,

24  I knew I was breaching my obligation to keep the information

25  confidential until the embargo expired.

SECNOTH00145747

Case: 1:09-cv-01543 Document #: 1 Filed: 03/11/09 Page 64 of 108 PageID #:64
Case: 05-cv-09835NMGDocDocument #74-33-2 Filed 03/10/2006 Page 2415 of 122

20

393fdavp                            SEALED

1            With most of my clients, I had no formal agreement to

2     provide pre-embargo information. With at least one of my

3     clients, however, I entered into an explicit agreement to call

4     and relay the information in advance of the embargo time.

5     Specifically, in May of 2001, I made such a call to John

6     Youngdahl, a vice president and senior economist at Goldman

7     Sachs. Mr. Youngdahl was a new client, and I hoped that the

8     pre-embargo refunding information would persuade him to remain

9     a client.

10           On July 12, 2001, I received an e-mail from

11    Mr. Youngdahl in which Mr. Youngdahl acknowledged that I had

12    provided him with pre-embargo information relating to the May

13    2001 refunding press conference. In that e-mail, Mr. Youngdahl

14    also asked me if I would give pre-embargo information to him as

15    a, quote, routine matter, unquote, beginning with the August 1,

16    2001 quarterly refunding press conference. That same day, I

17    replied to Mr. Youngdahl via e-mail and informed him that I

18    would call him with that information before the embargo

19    expired, quote, with the understanding that everything is

20    embargoed until the embargo time, unquote. Shortly thereafter,

21    I had a telephone conversation with Mr. Youngdahl in which the

22    details of this arrangement were confirmed.

23           On August 1, 2001, I attended the quarterly refunding

24    press conference at Treasury. As was my practice, I made a

25    series of phone calls to clients, including Mr. Youngdahl,

SECNOTH00145748

393fdavp                    SEALED

1    before the embargo expired.

2            At the October 31st, 2001, quarterly refunding press

3    conference, the Treasury Department issued the surprising

4    announcement that it was discontinuing the 30-year bond.  The

5    move was widely unexpected and I anticipated that many clients

6    would potentially suffer financial harm when the news became

7    public.  The press conference concluded shortly before 9:30

8    a.m. and it was announced that the information would be

9    embargoed until ten a.m.  I immediately exited the Treasury

10   Department and began calling clients on my cell phone to report

11   the news.  Among the clients I reached was Mr. Youngdahl.  I

12   told Mr. Youngdahl that Treasury had decided to discontinue the

13   30-year bond.  I also told Mr. Youngdahl that the information

14   was embargoed until 10 a.m.  My call to him took place around

15   9:30 a.m.  My expectation was that Mr. Youngdahl and Goldman

16   Sachs would use the information to their advantage in trading

17   government securities.  I believed that once this information

18   became public, prices of the 30-year bond would escalate

19   dramatically, and I knew my pre-embargo repot would allow

20   Mr. Young and my other clients to make significant moves in

21   advance of the market responding to the official public

22   release.

23           THE COURT:  All right.  I had one question, which is

24   do you agree that this embargoed information was government

25   property having value of more than $1,000?

                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

SECNOTH00145749

22

393fdavp                    SEALED

1       THE DEFENDANT:  Yes, I do, your Honor.

2       THE COURT:  And do you agree that you intended to

3   defraud the government?

4       THE DEFENDANT:  Yes, your Honor.

5       THE COURT:  Mr. Hotz, do you think any other questions

6   are needed?

7       MR. HOTZ:  No, your Honor.

8       THE COURT:  All right.  We are up to the final

9   question.  I'm going to read these counts.  I'm going to skip

10  practically all of the language, and then I am going to ask you

11  how do you plead, guilty or not guilty.

12      On Count One, I'm turning to paragraph 27.  The United

13  States Attorney charges from on or about July 12, 2001, to or

14  about October 31, 2001, in the Southern District of New York

15  and elsewhere, Peter J. Davis, Jr. and John Youngdahl, together

16  with other persons, unlawfully, willfully and knowingly did

17  conspire to defraud the United States and to commit offenses

18  against the United States, to wit, and now I am summarizing,

19  conversion of property of the U.S. and the Department of

20  Treasury, also securities fraud and also wire fraud.

21      And I am noting at paragraph 33 that there is a

22  detailed statement of some of the means and methods of this

23  conspiracy and then there is a statement about overt acts, and

24  I am just going to read paragraph 34.

25      In furtherance of this conspiracy, and to effect the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SECNOTH00145750

23

393fdavp                    SEALED

1    unlawful objects of the conspiracy, the following overt acts

2    took place, and reading down to the fifth alleged overt act, E,

3    on or about October 31, 2001, Davis placed a cellular telephone

4    call from Washington D.C. to John Youngdahl at Goldman's

5    offices in New York, New York.  That is the essential elements

6    of this very lengthy Count One, a conspiracy to defraud the

7    United States and to commit wire fraud, securities fraud, and

8    conversion of U.S. property.

9           Mr. Davis, how do you plead to Count One of the

10   information?

11          THE DEFENDANT:  Guilty, your Honor.

12          THE COURT:  Count Two charges you with actually

13   committing the crime of conversion of property in the U.S.  It

14   starts off by re-alleging a number of prior paragraphs, and

15   then it says, as follows at paragraph 36, from at least 1999 up

16   to and including October 31, 2001, Peter J. Davis Jr., in the

17   Southern District of New York and elsewhere, did knowingly

18   convert to his own use and the use of others and without

19   authority, conveyed and disposed things of value of the United

20   States, and departments and agencies of the United States, with

21   a value greater than $1,000; namely, the embargoed

22   confidential, non-public information set forth above in

23   violation of Title 18, U.S. Code Section 641.

24          Mr. Davis, how do you plead to Count Two?

25          THE DEFENDANT:  Guilty, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SECNOTH00145751

24

393fdavp                    SEALED

1          THE COURT:  And, finally, Count Three charges

2     securities fraud.  It re-alleges several prior paragraphs and

3     then it says on or about October 31, 2001, in the Southern

4     District of New York and elsewhere, Peter J. Davis, Jr. and

5     other persons unlawfully, willfully and knowingly, directly and

6     indirectly, by use of a means and instrumentalities of

7     interstate commerce and of the mails, did use and employ in

8     connection with the purchase and sale of securities

9     manipulative and deceptive devices by employing devices,

10    schemes and artifices to defraud and by engaging in acts,

11    practices and courses of business which would operate as a

12    fraud and deceit upon persons in connection with the purchase

13    and sale of 30-year Treasury bonds and 30-year bond futures

14    contracts.

15          That is the essential elements of Count Three.

16    Mr. Davis, how do you plead to Count Three?

17          THE DEFENDANT:  Guilty, your Honor.

18          THE COURT:  I make the following findings for the

19    benefit of Judge Scheindlin.

20          I find that Mr. Davis is fully competent.  I find that

21    he's capable of entering an informed plea.  I find that he's

22    aware of the nature of the charges and aware of the

23    consequences of the plea.  I find that his plea of guilty is a

24    knowing and voluntary plea, supported by an independent basis

25    in fact containing each of the essential elements of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SECNOTH00145752

393fdavp                    SEALED

1   offense. I, therefore, recommend that Judge Scheindlin accept

2   the guilty plea and adjudge Mr. Davis guilty of these three

3   felonies.

4           I direct the government to order the transcript and to

5   get it to the district judge as soon as possible.

6           I will also fill out a written form for Judge

7   Scheindlin. And I direct Mr. Davis to report to the Probation

8   Department so that they can get started on the presentence

9   report. They may want to just, in effect, register him for a

10  while.

11          MR. HOTZ: Your Honor, we have a control date for

12  sentencing from Judge Scheindlin of December 3rd at 4:30, and

13  that is, as I said, a control date.

14          THE COURT: Right.

15          MR. HOTZ: I will advise probation of that, but I

16  would propose that we not have any interview until such time as

17  Mr. Davis has fulfilled his obligations under the agreement and

18  we will raise it with Judge Scheindlin.

19          THE COURT: Is there anything further?

20          MR. HOTZ: Yes, your Honor, there is one other matter.

21  It's just to set bail for Mr. Davis.

22          THE COURT: Oh, yes. That was part of the plea

23  agreement near the end, that there would be a $500,000 personal

24  recognizance bond and --

25          MR. HOTZ: Your Honor, we have --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

393fdavp                    SEALED

1          THE COURT: -- standard conditions.

2          MR. HOTZ: Yes. We have proposed that the defendant,

3    in addition, surrender his passport, which I understand he will

4    do, and that travel be restricted to the 50 states of the

5    United States.

6          THE COURT: All right.

7          MR. HOTZ: We also --

8          THE COURT: We will have to type up a bond here. That

9    will take maybe half an hour, maybe more since it's lunchtime,

10   and you will be released as soon as you sign this bond. How

11   soon can the passport be surrendered?

12         MS. SPEARING: Your Honor, I can get it to Mr. Hotz

13   tomorrow.

14         MR. HOTZ: Your Honor, within a week is fine.

15         THE COURT: Well, we will say within a week. By

16   September 10.

17         All right. Is there anything further?

18         MS. SPEARING: No, your Honor.

19         THE COURT: Okay. I just need a disposition sheet. I

20   will fill it out, which will enable the people next door to get

21   started typing the bond.

22         MR. HOTZ: I'm sorry, your Honor. There is one other

23   matter, a housekeeping matter that I neglected to mention.

24         Mr. Davis needs to be processed by the marshals, and

25   we would just ask that you direct that at the conclusion of his

SECNOTH00145754

27

393fdavp                    SEALED

1    signing the bail that he be processed the marshals.  He's been

2    processed by the Postal Inspection Service.

3            THE COURT:  Maybe the marshals can start processing

4    him.

5            THE DEPUTY CLERK:  We don't have one.  There is no one

6    here.

7            MR. HOTZ:  We can take him and have it done at the

8    conclusion of signing the bail, your Honor.

9            THE COURT:  Okay.  Before or after as the case may be.

10           All right.  Okay.  Everyone is excused.  I will just

11   fill out this disposition sheet and also this short form report

12   and recommendation to Judge Scheindlin.

13           MS. SPEARING:  Thank you, your Honor.

14                              oOo

15

16

17

18

19

20

21

22

23

24

25

SECNOTH00145755

# EXHIBIT 3

Doc#12

1

3BC6YOUP

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4          v.                  03 CR 991(DLC)

5    JOHN YOUNGDAHL,

6          Defendant.

7    ------------------------------x

8                          New York, N.Y.
                        November 12, 2003
9                         10:05 a.m.

10

11    Before:

12                  HON. DENISE L. COTE,

13                              District Judge

14                     APPEARANCES

15    JAMES B. COMEY
       United States Attorney for the
16        Southern District of New York
   ROBERT H. HOTZ, JR.
17    BRIAN COAD
       Assistant United States Attorneys
18

19    KRONISH LIEB WEINER & HELLMAN, LLP
       Attorneys for Defendant John Youngdahl
20    BY: ALAN LEVINE
       STEVE COHEN

21    Also present:   ROBERT MANCHAK, Criminal Investigator
                   CARL VACCARIELLO, Postal Inspector
22

23

24

25

3BC6YOUP

1 UNITED STATES DISTRICT COURT
  SOUTHERN DISTRICT OF NEW YORK
2 ------------------------------x

3 UNITED STATES OF AMERICA,

4     v.        03 CR 991(DLC)

5 JOHN YOUNGDAHL,

6     Defendant.

7 ------------------------------x

8            New York, N.Y.
            November 12, 2003
9            10:05 a.m.

10

11 Before:

12        HON. DENISE L. COTE,

13            District Judge

14         APPEARANCES

15 JAMES B. COMEY
    United States Attorney for the
16    Southern District of New York
  ROBERT H. HOTZ, JR.
17 BRIAN COAD
    Assistant United States Attorneys
18

19 KRONISH LIEB WEINER & HELLMAN, LLP
    Attorneys for Defendant John Youngdahl
  BY: ALAN LEVINE
20    STEVE COHEN

21 Also present: ROBERT MANCHAK, Criminal Investigator
         CARL VACCARIELLO, Postal Inspector
22

23

24

25

3BC6YOUP                    Plea                                    2

1              (In open court; case called)

2         THE DEPUTY CLERK:  Is the government ready to proceed?

3         MR. HOTZ:  Good morning, your Honor.  Robert Hotz for

4    the government, with me is AUSA Brian Coad, Postal Inspector

5    Carl Vaccariello, and Investigator Robert Manchak from our

6    office.

7         THE COURT:  Good morning.

8         THE DEPUTY CLERK:  For the Defendant Youngdahl, are

9    you ready to proceed?

10        MR. LEVINE:  We are, your Honor.

11        THE DEPUTY CLERK:  State your name for the record.

12        MR. LEVINE:  Alan Levine and Steve Cohen from Kronish,

13   Lieb, Weiner & Hellman for the defendant.

14        THE COURT:  Thank you.  Good morning.  I have received

15   a copy of a plea agreement dated October 31, 2003 and I have

16   just one question for the parties with respect to the sentence:

17        The maximum sentence possible on Count Four under

18   Section 1343, is there information about the date of the crime

19   such that the current statutory provisions do not apply?

20        MR. HOTZ:  Your Honor, I believe the date of the crime

21   would be October 31, 2001.

22        THE COURT:  Okay.

23        MR. HOTZ:  Your Honor, I believe that the sentencing

24   change in the maximum sentence of imprisonment went into effect

25   July 30, 2002.  The crime here occurred on October 31, 2001.

3BC6YOUP                          Plea                                        3

1            THE COURT:  Fine.  Thank you.  I just wanted that

2    clarification for the record.

3            MR. HOTZ:  Thank you, your Honor.

4            THE COURT:  I appreciate it.

5            Mr. Youngdahl, please stand.  I have been notified

6    that you wish to enter a plea of guilty to Counts One, Two,

7    Three and Four of the indictment that has been filed against

8    you; is that correct?

9            THE DEFENDANT:  Yes, your Honor.

10           THE COURT:  Before accepting your plea, I am going to

11   ask you certain questions so I can establish to my satisfaction

12   that you are pleading guilty because you are guilty and not for

13   some other reason.  If at any time you have difficulty

14   understanding my questions or if you wish for further

15   opportunity to consult with your lawyer, will you let me know?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Please swear the defendant.

18           THE DEPUTY CLERK:  Please raise your right hand.

19           (Defendant sworn)

20           THE COURT:  You are now under oath, and if you answer

21   any of my questions falsely, you can be prosecuted for perjury.

22           Do you understand that?

23           THE DEFENDANT:  Yes, your Honor.

24           THE COURT:  What is your full name?

25           THE DEFENDANT:  John Mason Youngdahl.

3BC6YOUP            Plea

1           THE COURT: How old are you?

2           THE DEFENDANT: 44 years old.

3           THE COURT: How far did you go in school?

4           THE DEFENDANT: I graduated from graduate school, both

5 law and business school.

6           THE COURT: Have you ever been treated or hospitalized

7 for any mental illness?

8           THE DEFENDANT: No, your Honor.

9           THE COURT: Are you now or have you recently been

10 under the care of a doctor or a psychiatrist?

11           THE DEFENDANT: No, your Honor.

12           THE COURT: Have you ever been hospitalized or treated

13 for any addiction to drugs or to alcohol?

14           THE DEFENDANT: No, your Honor.

15           THE COURT: Have you ever been addicted to drugs or

16 alcohol?

17           THE DEFENDANT: No, your Honor.

18           THE COURT: Have you in the last 24 hours taken any

19 drugs, medicine or pills or drunk any alcoholic beverages?

20           THE DEFENDANT: No, your Honor.

21           THE COURT: Is your mind clear today?

22           THE DEFENDANT: Yes, it is, your Honor.

23           THE COURT: Do you understand what is happening in

24 this proceeding?

25           THE DEFENDANT: Yes, your Honor.

1          THE COURT:  Do any counsel have any doubt as to the

2    defendant's competence to enter a plea of guilty?

3          MR. HOTZ:  No, your Honor.

4          MR. LEVINE:  No, your Honor.

5          THE COURT:  Based on my observations of Mr. Youngdahl,

6    his demeanor as he appears here before me, and his responses to

7    my questions, I find he is competent to enter a plea of guilty.

8          Now, Mr. Youngdahl, have you had a sufficient

9    opportunity to discuss your case with your lawyers?

10         THE DEFENDANT:  Yes, your Honor.

11         THE COURT:  Have you had an opportunity to discuss

12   with them the charges that are pending against you, any

13   defenses that you have to those charges, and the consequences

14   to your entering a plea of guilty?

15         THE DEFENDANT:  Yes, your Honor.

16         THE COURT:  Are you satisfied with your attorneys'

17   representation of you?

18         THE DEFENDANT:  Yes, I am.

19         THE COURT:  I am now going to explain certain

20   constitutional rights that you have.  You will be giving up

21   these rights if you enter a plea of guilty.  Under the

22   constitution and laws of the United States, you are entitled to

23   a speedy and public trial by a jury on the charges contained in

24   the indictment that has been filed against you.

25         Do you understand that?

3BC6YOUP                    Plea

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  At that trial, you would be presumed to be

3   innocent and the government would be required to prove you

4   guilty by competent evidence and beyond a reasonable doubt.

5   Before you could be found guilty, you would not have to prove

6   that you were innocent and a jury of 12 people would have to

7   agree unanimously that you were guilty.

8          Do you understand that?

9          THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  At that time and at every stage of your

11   case, you would be able to be represented by a lawyer, and if

12   you could not afford one, one would be appointed to represent

13   you.

14          Do you understand that?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  The trial -- the witnesses for the

17   government would have to come to court and testify in your

18   presence, and your lawyers could cross-examine the witnesses

19   for the government, object to evidence offered by the

20   government, and, if you desired, issue subpoenas, offer

21   evidence, and compel witnesses to come to court and testify on

22   your behalf.

23          Do you understand that?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  At a trial, although you would have the

3BC6YOUP                    Plea

7

1   right to testify if you chose to do so, you would also have the

2   right not to testify.  And no inference or suggestion of guilt

3   would be drawn from the fact that you did not testify if that

4   is what you chose to do.

5           Do you understand that?

6           THE DEFENDANT:  Yes, your Honor.

7           THE COURT:  Do you understand if you were convicted at

8   trial, you would have the right to appeal that verdict?  Do you

9   understand that.

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  Even now, you have the right to change

12  your mind and plead not guilty and go to trial.  Do you

13  understand that?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  If you plead guilty and I accept your

16  plea, you are going to give up your right to a trial and other

17  constitutional rights I just described; there will be no trial.

18  And I enter a judgment of guilty and sentence you based on your

19  guilty plea after I read whatever submissions I get from you

20  and your lawyers and the government's lawyers and after I read

21  a presentence report, prepared by the probation department.

22          Do you understand that?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  If you plead guilty, you are also going to

25  have to give up your right not to incriminate yourself, because

3BC6YOUP                    Plea

1    I am going to ask you what you did and you are going to have to

2    describe your conduct to me.

3         Do you understand that?

4         THE DEFENDANT:  Yes, your Honor.

5         THE COURT:  Let me make sure you understand what you

6    are charged with here.

7         Count One charges you with a conspiracy.  A conspiracy

8    is an agreement between two or more people to violate the law.

9    And Count One charges you with knowingly and willingly

10   participating in a conspiracy between July 21 and October 31,

11   2001.  It charges that some of the conspiratorial acts occurred

12   in the Southern District of New York, which includes among

13   other locations Manhattan.  It charges that you and others

14   conspired together to defraud the United States and to commit

15   offenses against the United States, specifically to convert

16   property of the United States and the Treasury Department to

17   commit securities fraud and to commit wire fraud.

18        Do you understand that is what you are charged with in

19   Count One?

20        THE DEFENDANT:  Yes, your Honor.

21        THE COURT:  I am going to explain wire fraud and

22   securities fraud in a moment and the elements in connection

23   with each of them and I am also going to explain the crime of

24   conversion of property.

25        Let me explain or give you an example of something you

3BC6YOUP          Plea

1   are charged with having done to help make this conspiracy

2   succeed and I will just use the first overt act against you,

3   which is on page 18.  It charges that on or about July 12, 2001

4   you sent an e-mail from your computer at Goldman Sachs' offices

5   in New York to a Mr. Peter Davis in Washington D C.

6          Do you understand that is an example that is given of

7   something you did to help make this conspiracy succeed?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  Count Two charges you with conversion of

10  property.  It charges that during the period from about

11  August 1 to October 31, 2001 and again in the Southern District

12  of New York and elsewhere, you did receive, conceal or retain

13  things of value of the United States and/or departments or

14  agencies of the United States that had a value greater than

15  $1,000, namely, this is what they are referring to there, the

16  embargoed, confidential, nonpublic information that is

17  described in this indictment and that you did that with intent

18  to convert it to your own use and gain knowing that it had been

19  stolen, purloined or converted.

20         Do you understand that is what you are charged with in

21  Count Two?

22         THE DEFENDANT:  Yes, your Honor.

23         THE COURT:  Let's go to Count Three, the securities

24  fraud count.  This covers the period July 12 to October 31,

25  2001.  Again, it charges that at least some of the acts with

3BC6YOUP          Plea

1    the action of this crime occurred in the Southern District of

2    New York. It charges that you directly and indirectly by use

3    of the means and instrumentalities of interstate commerce and

4    of the mails did use or employ in connection with the purchase

5    or sales of securities manipulative or deceptive devices and

6    contrivances either by employing devices, schemes or artifices

7    to defraud or by making untrue statements of material facts and

8    omitting to state material facts necessary in order to make

9    statements made not misleading in the light of the

10    circumstances under which they were made, or engaging in acts

11    practices and courses of businesses which operated and would

12    operate as a fraud, of deceit upon persons all of this in

13    connection with the purchase and sale of 30-year Treasury bonds

14    and 30-year bond futures contracts.

15         Do you understand that is what you are charged with in

16    Count Three?

17         THE DEFENDANT: Yes, your Honor.

18         THE COURT: The last count that is at issue in this

19    proceeding this morning is Count Four. That's the wire fraud

20    count. Let me describe that to you. It charges that you

21    engaged in an act of wire fraud on or about October 31, 2001

22    and again in the Southern District of New York. It charges

23    that you having devised, intending to devise a scheme and

24    artifice to defraud and to obtain money and property by means

25    of false and fraudulent pretenses, representations or promises,

3BC6YOUP                    Plea

1    that you willfully and knowingly would and did transmit or

2    cause to be transmitted by means of wire communication in

3    interstate or foreign commerce writing, signs, signals,

4    pictures or sound for the purpose of executing a scheme or

5    artifice to defraud.  Again, it is specifically referring to a

6    conversation that you had by telephone with Peter Davis while

7    you were in New York and he was in Washington D C.

8            Do you understand that is what you are charged with in

9    Count Four?

10           THE DEFENDANT:  Yes, your Honor.

11           THE COURT:  Let me describe to you the penalties that

12   apply to these crimes:  Count One, the conspiracy count has a

13   maximum term of imprisonment of five years.  Count Two has a

14   maximum term of imprisonment of 10 years.  Count Three has a

15   maximum term of imprisonment of 10 years.  Count Four, the wire

16   fraud count, has a maximum term of imprisonment of five years.

17   Therefore together, these terms of imprisonment when they are

18   placed one on top of another have a total maximum term of

19   imprisonment of 30 years.

20           Do you understand that?

21           THE DEFENDANT:  Yes, your Honor.

22           THE COURT:  With respect to each of these sentences or

23   crimes, there is also a maximum fine that can be imposed with

24   respect to Count One, the conspiracy count, Count Two, the

25   conversion of property count, and Count Four, the wire fraud

3BC6YOUP                    Plea

1    count, the maximum fine that can be imposed is $250,000 or

2    twice the gross gain or loss from the crime.

3              Do you understand that?

4              THE DEFENDANT:  Yes, your Honor.

5              THE COURT:  With respect to Count Three, the

6    securities fraud count, the maximum fine that can be imposed is

7    $1 million or twice the gross gain or loss.

8              Do you understand that?

9              THE DEFENDANT:  Yes, your Honor.

10             THE COURT:  In connection with each of these counts,

11   there is also a separate requirement for each count that you

12   pay a special assessment of $100.

13             Do you understand that?

14             THE DEFENDANT:  Yes, your Honor.

15             THE COURT:  With respect to each of these counts,

16   there is also a maximum term of supervised release of three

17   years.

18             Do you understand that?

19             THE DEFENDANT:  Yes, your Honor.

20             THE COURT:  Supervised release means that you will be

21   subject to monitoring when released from prison.  There are

22   terms of supervised release in which you must comply and if you

23   do not comply with them, you can be returned to prison without

24   a jury trial.  You will be given no credit for any time you

25   already spent in prison and no credit for any time you spent on

3BC6YOUP                    Plea

1    post-release supervision.

2              Do you understand that?

3              THE DEFENDANT:  Yes, your Honor.

4              THE COURT:  Also, in connection with each of these

5    crimes, there is a requirement that you pay restitution.

6              Do you understand that?

7              THE DEFENDANT:  Yes, your Honor.

8              THE COURT:  Are you an American citizen?

9              THE DEFENDANT:  Yes, your Honor.

10             THE COURT:  Now, this case is also going to be

11   governed by what are called the sentencing guidelines.

12             Have you discussed the sentencing guidelines with your

13   lawyers?

14             THE DEFENDANT:  Yes, your Honor.

15             THE COURT:  Sentencing guidelines are contained in a

16   book like the one I am showing you here.  In very general

17   terms, sentencing guidelines decide what the sentence is of an

18   individual defendant by looking at two things.  It looks at the

19   criminal history record, and two, it looks at the conduct

20   related to the offenses to which you are pleading guilty.

21             There is a grid at the very back of this book like I

22   am showing you now.  Along the horizontal axis that runs across

23   the top of the grid are the various criminal history

24   categories.  And along the vertical axis that runs down the

25   side are the various offense levels for the criminal conduct.

3BC6YOUP                    Plea

1   And where these two intersect on this grid for you is the range

2   of months I have to send you to prison unless I find in your

3   case there is a circumstance of a kind or degree that is so

4   unusual that it hasn't already adequately been taken into

5   account by the folks who wrote this book.  If I find in your

6   case such an unusual circumstance exists, I can depart or I can

7   depart down from the guidelines range that would otherwise

8   apply.

9          Do you understand that?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  Do you understand that if your attorney or

12  anyone else has attempted to predict to you what your sentence

13  will be that their prediction could be wrong; do you understand

14  that?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  No one, not your attorney, not the

17  government's attorneys, no one can give you any assurance of

18  what your sentence will be because I am going to decide your

19  sentence, but I am not going to do it now.  I am going to wait.

20  I am going to wait until I get a presentence report prepared by

21  the Probation Department, do my own calculation of what your

22  guidelines range is and decide if I should depart up or down

23  from that range, and only then will I decide your sentence.

24          Do you understand that?

25          THE DEFENDANT:  Yes, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3BC6YOUP                          Plea

1        THE COURT:  Even if your sentence is different from

2   what your attorney or anyone else has told you it might be,

3   even if is it different from what is contained in a written

4   plea agreement between you and the government, you are still

5   going to be bound by your plea of guilty and cannot withdraw

6   your plea of guilty.

7        Do you understand that?

8        THE DEFENDANT:  Yes, your Honor.

9        THE COURT:  Has anyone threatened you or forced you in

10  any way to plead guilty?

11       THE DEFENDANT:  No, your Honor.

12       THE COURT:  Now, I understand that there is a written

13  plea agreement between you and the government.  I want to ask

14  you some questions about it.

15       Do you have a copy in front of you right now?

16       THE DEFENDANT:  Yes, your Honor.

17       THE COURT:  Does it have the date of October 31 on the

18  very first page?

19       THE DEFENDANT:  Yes, it does, your Honor.

20       THE COURT:  Does it have eight page in all?

21       THE DEFENDANT:  Yes, your Honor.

22       THE COURT:  Is your signature on the last page?

23       THE DEFENDANT:  Yes, your Honor.

24       THE COURT:  What is the date next to your signature?

25       THE DEFENDANT:  November 12 2003.

3BC6YOUP                         Plea

1           THE COURT:  That is today's date.  Did you sign this
2     today?
3           THE DEFENDANT:  Yes, I did.
4           THE COURT:  Did you read it before you signed it?
5           THE DEFENDANT:  Yes.
6           THE COURT:  When you signed it, did you believe that
7     you understood this document?
8           THE DEFENDANT:  Yes.
9           THE COURT:  Did you discuss it with your lawyers
10    before you signed it?
11          THE DEFENDANT:  Yes.
12          THE COURT:  Did anyone force you to sign this
13    document?
14          THE DEFENDANT:  No, your Honor.
15          THE COURT:  Do you have any agreement with the
16    government about your plea or about your sentence that has been
17    left out of this written agreement?
18          THE DEFENDANT:  No, your Honor.
19          THE COURT:  Do you understand that in this agreement
20    you and the government have arrived at a guidelines range, have
21    stipulated to a guideline range of 33 to 41 months in prison?
22          THE DEFENDANT:  Yes, your Honor.
23          THE COURT:  Do you understand that that calculation is
24    not binding on me?
25          THE DEFENDANT:  Yes, your Honor.

3BC6YOUP                     Plea

1          THE COURT:  Do you understand that by signing this

2    agreement, you have given up your right to argue to me that I

3    should sentence you to anything less than 33 months in prison?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  Do you understand that by signing this

6    agreement you have given up your right to appeal a sentence or

7    otherwise challenge or litigate a sentence so long as the

8    sentence is not greater than 41 months in prison?

9          THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  Has anyone made a promise or done anything

11    other than what is contained in this written plea agreement to

12    induce you or convince you to plead guilty?

13          THE DEFENDANT:  No, your Honor.

14          THE COURT:  Has anyone made a promise to you as to

15    what your sentence will be?

16          THE DEFENDANT:  No, your Honor.

17          THE COURT:  Tell me in your own words what you did

18    that makes you believe you are guilty of the charges contained

19    in this indictment?

20          THE DEFENDANT:  Early in 2001 while employed as an

21    economist at Goldman Sachs, I agreed that Goldman Sachs should

22    hire a political consultant with relationships at the Treasury

23    Department to provide advice regarding current legislative and

24    executive matters.  In the spring of 2001 after working with

25    the consultant for several months, the consultant transmitted

3BC6YOUP               Plea

1   information to me regarding a Treasury Department quarterly

2   refunding allowance.

3           I subsequently learned from the consultant that he had

4   obtained the information at a press briefing.  I understood

5   that the information provided in those briefings was

6   confidential and embargoed and that the information was not to

7   be released or used by attendees including the consultant until

8   a time that it had been specified by Treasury officials.

9           Thereafter, the consultant offered to provide me with

10  this information from a Treasury briefing in advance of the

11  expiration of the embargo and I agreed to accept this

12  information.  I understood that doing so was improper for both

13  the consultant and me.  On the morning of October 31, 2001 a

14  Treasury briefing was to be held but had been delayed for a

15  short period of time.  A Goldman trader who knew of my

16  relationship with the consultant asked whether I had heard from

17  the consult.  A short time later the consultant told me after

18  he phoned me at the Goldman trading desk where I worked in

19  Manhattan, he told me among other things that the Treasury

20  Department was eliminating the 30-year Treasury bond.

21          I understood that this information was significant

22  news, that the consultant had learned this information at the

23  briefing, that the embargo had not yet expired, and by

24  providing the information to me he was violating that embargo.

25          Before the embargo expired, I told the trader that I

3BC6YOUP            Plea

1    had heard from the consultant and repeated the news about the

2    elimination of the 30-year bonds.  I knew the trader would use

3    the information and later learned that Goldman had profited

4    from the information received from the consultant.

5       On approximately August 15, 2002 and again on

6    October 29, 2002 I was interviewed by the U.S. Attorney's

7    Office for the Southern District of New York.  During those

8    interviews I denied when they were asking whether a consultant

9    was present at quarterly refunding announcements or knowing the

10    source of his information.  I also denied having an

11    understanding or expectation that the consultant would provide

12    me embargoed information or knowing that the consultant

13    received information concerning the refunding announcements

14    before the expiration of the embargo directed from the

15    Treasury.  Those statements were false.

16       On approximately February 4, 2003 I testified in an

17    SEC proceeding.  During that proceeding, the SEC staff asked me

18    a series of questions about whether the consultant and I had

19    ever had conversations about him getting embargoed information

20    by attending the Treasury briefings.  I was also asked about a

21    series of e-mail messages dated July 12, 2001 between the

22    consultant and me.  I denied knowing that the consultant

23    attended the Treasury briefings.  I also denied ever sending or

24    receiving e-mail messages.  Those statements were untrue.

25       THE COURT:  Where were you when you had those

3BC6YOUP                    Plea

1    conversations with the consultant?

2            THE DEFENDANT:  I was in Manhattan.

3            THE COURT:  You understood at the time that you shared

4    this information with the trader as you described that he would

5    use that information to trade for Goldman's benefit?

6            THE DEFENDANT:  Yes, your Honor.

7            THE COURT:  Count Two charges you with conversion of

8    property of the United States and among other things it has an

9    element that the conversion was made with intent to convert the

10   information for your own use and gain.

11           Can you explain to me how you expected that

12   transmittal of the embargoed information would ultimately inure

13   to your own gain?

14           THE DEFENDANT:  I expected that Goldman would profit

15   from the information and that this would ultimately benefit me

16   as a member of Goldman Sachs employee -- employee and someone

17   who has provided the information.

18           THE COURT:  Was there a mechanism for you to receive a

19   bonus or a salary increase based on your assistance in the

20   trading of bonds, for instance, or are you talking about just

21   generally Goldman being more profitable, you would get in a

22   general way an increased financial benefit?

23           THE DEFENDANT:  There was an annual bonus procedure

24   and it was my expectation that that bonus could be enhanced by

25   having provided timely information to the Goldman traders to

3BC6YOUP                    Plea

1   their profit.

2         THE COURT:  Thank you.

3         Does the government counsel agree there is a

4   sufficient factual predicate for a guilty plea?

5         MR. HOTZ:  Yes, your Honor.

6         THE COURT:  Does defense counsel agree?

7         MR. LEVINE:  Yes, your Honor.

8         THE COURT:  Does defense counsel know of any valid

9   defense that would prevail at trial or any reason why your

10  client should not be permitted to plea guilty?

11        MR. LEVINE:  No, your Honor.

12        THE COURT:  Mr. Youngdahl, since you have acknowledged

13  that you are in fact guilty as charged in these four counts of

14  the indictment, since I am satisfied that you know of your

15  rights including your right to go to trial, and that you are

16  aware of the consequences of your pleaing including the

17  sentence that may be imposed, and since you are voluntarily

18  pleading guilty, I enter a judgment of guilty on the first four

19  counts of this indictment.

20        MR. LEVINE:  Your Honor, I will make a motion for

21  dismissal of the remaining counts at the time of sentence.

22        THE COURT:  Okay.  Now, the Probation Department is

23  going to want to interview Mr. Youngdahl to help them prepare a

24  presentence report.  If you speak with them, make sure anything

25  you say is truthful and accurate.  I read their report

3BC6YOUP                    Plea

1    carefully and it is important to me in deciding what sentence

2    to impose.  You read it carefully, too.  If you see any errors,

3    point them out to your attorneys so they can bring them to my

4    attention; all right?

5           THE DEFENDANT:  Yes, your Honor.

6           THE COURT:  Are defense counsel planning to give me

7    sentencing submissions or not?

8           MR. COHEN:  Yes, your Honor.

9           THE COURT:  We will stick with the regular schedule

10   then for sentence.  Sentence will be --

11          THE DEPUTY CLERK:  January 30 at 2:00 p.m.

12          THE COURT:  I want defense submissions at least two

13   weeks before --

14          THE DEPUTY CLERK:  January 16.

15          THE COURT:  And any government responses --

16          THE DEPUTY CLERK:  January 23.

17          THE COURT:  Any objection to continuing Mr. Youngdahl

18   on bail?

19          MR. HOTZ:  No, your Honor.

20          THE COURT:  Mr. Youngdahl, you must be in this

21   courtroom at the time and place of sentence.  Failure to appear

22   can subject you to additional charges.  Any violation of terms

23   of your release before sentence could have serious consequences

24   for you at the time of sentence.

25          Do you understand that?

23

| 3BC6YOUP | Plea |
|---|---|

1    THE DEFENDANT:  Yes, your Honor.

2    THE COURT:  You may be seated.

3    Is there anything else that we need to do?

4    MR. HOTZ:  Nothing from the government at this time,

5  your Honor.

6    THE COURT:  Thank you.

7                         o0o

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 4

Goldman, Sachs & Co.: Admin. Proc. Rel. No. 34-48436 / September 4, 2003

Case: 1:09-cv-01543 Document #: 1 Filed: 03/11/09 Page 98 of 108 PageID #:98

Page 1 of 11



# U.S. Securities and Exchange Commission

**United States of America**
**before the**
**Securities and Exchange Commission**

**Securities Exchange Act of 1934**
**Release No. 48436 / September 4, 2003**

**Administrative Proceeding**
**File No. 3-11240**

| | |
|---|---|
| In the Matter of<br><br>GOLDMAN, SACHS & CO.,<br><br>Respondent. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER PURSUANT TO SECTIONS 15(b)(4), 15C(c)(1)(A) AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934 |

## I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 15(b)(4), 15C(c)(1)(A) and 21C of the Securities Exchange Act of 1934 (the "Exchange Act") against Goldman, Sachs & Co. ("Goldman Sachs" or "Respondent").

## II.

In anticipation of the institution of these proceedings, Goldman Sachs has submitted an Offer of Settlement (the "Offer"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission or to which the Commission is a party, and without admitting or denying the findings set forth herein, except as to the Commission's jurisdiction over the Respondent and over the subject matter of these proceedings which are admitted, Respondent consents to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Sections 15(b)(4), 15C(c)(1)(A) and 21C of the Securities Exchange Act of 1934, as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds that[1]:

## A. FACTS

### 1. Summary

This matter concerns Goldman Sachs' purchases of United States Treasury 30-year bonds immediately after one of its employees received and conveyed to traders material, nonpublic information that the United States Department of the Treasury ("Treasury Department") was about to announce the suspension of future bond issuances. At a press conference on the morning of October 31, 2001, the Treasury Department announced its refunding requirements for the fourth quarter of 2001. The Treasury Department set an embargo time of 10:00 a.m. for the public release of the refunding information.

Peter Davis, a Washington, D.C.-based political consultant hired by Goldman Sachs, among others, attended the press conference and knew that the information was embargoed until 10:00 a.m. Davis had attended such refunding press conferences for a number of years. News announced at the refunding press conferences was typically embargoed until a certain time. Davis had expressly agreed to honor the news embargos.

At approximately 9:35 a.m. on October 31, after the refunding press conference but before the lifting of the news embargo, Davis telephoned John Youngdahl, a Vice President and a Senior Economist in Goldman Sachs' Global Economics Group, who, among other duties, provided economic analysis for Goldman Sachs' U.S. Government securities desk (the "Treasury Desk"). Davis told Youngdahl, among other things, that the Treasury Department would suspend the issuance of 30-year bonds. Davis and Youngdahl had previously entered into an agreement whereby Davis would attend the Treasury Department's quarterly refunding press conferences and provide embargoed information to Youngdahl.

Youngdahl told traders on the Treasury Desk the information that Davis provided concerning the suspension of the 30-year bond. Youngdahl and the traders understood that the Treasury Department's refunding announcement would be released at 10:00 a.m. and that the refunding information was confidential until released. The traders purchased $84 million in par value of 30-year bonds for Goldman Sachs' proprietary accounts before 9:43 a.m., when the Treasury Department posted the refunding announcement on its website. The traders sold the bonds shortly after the first wire service reports of the Treasury Department action and made profits of $1,576,561 for Goldman Sachs. The traders also made profits of $2,318,500 on 2,336 bond futures contracts that they purchased between the time of Davis' telephone call and 9:43 a.m.

Goldman Sachs failed to establish, maintain and enforce written policies and procedures reasonably designed to prevent the misuse of material nonpublic information potentially obtained by outside consultants. Goldman Sachs, and in particular the Treasury Desk, utilized a number of paid consultants who collected information from a variety of sources. Therefore, although Goldman Sachs had policies and procedures regarding the use of confidential information, including information obtained from external sources such as clients, potential clients and other third parties generally, its policies and procedures should have identified specifically the potential for receiving material, nonpublic information from outside consultants.

### 2. Respondent

Goldman Sachs is a broker-dealer headquartered in New York City and registered with the Commission pursuant to Section 15 of the Exchange Act.

### 3. Quarterly Refunding Press Conferences

During the relevant period, the Treasury Department held refunding press conferences four times per year. Calendar year 2001 quarterly refunding announcements took place on January 31, May 2, August 1 and October 31. In these quarterly refunding announcements, the Treasury Department informs the public about the federal Government's financing plans for the following quarter. The information conveyed may include details of the Treasury Department's plans for buybacks and issuances of Treasury securities. The Treasury Department's practice was to set an embargo time at the press conference for the public release of the refunding information. The embargo policy enabled the press to disclose simultaneously in an accurate and orderly fashion to all market participants the information the Treasury Department disclosed at the press conferences.

### 4. Peter Davis' Attendance at Quarterly Refunding Press Conferences

Peter Davis attended the Treasury Department's quarterly refunding press conferences on a regular basis for several years prior to October 2001. A Treasury Department official had granted Davis permission to attend the press conferences on the condition that Davis expressly agreed to honor the news embargo. Davis expressly agreed to do so.

### 5. Goldman Sachs' Relationship with Peter Davis

In early 2001, another employee of Goldman Sachs suggested to Youngdahl that he meet with Davis, whose clients included several securities and investment firms. Davis was recommended to Youngdahl because of Davis' contacts in and knowledge about the federal Government. Youngdahl first met Davis in mid-February 2001. At that meeting, Davis explained to Youngdahl, among other things, that he knew people at the Treasury Department. Davis also gave Youngdahl a sales brochure. Davis told Youngdahl that he had good contacts and could give information about developments in Congress and in the administration.

Subsequently, in May 2001, Davis e-mailed the brochure for his firm, Davis Capital Investment Ideas, to Youngdahl, who then forwarded it to others at Goldman Sachs. Davis' brochure states, in part, "My ability to generate such information, before it reaches the media, derives from relationships built over 26 years of working with Washington policymakers." It further states, "Advance information is only half the battle. The other half is supplying the judgment to turn advance information into an investment idea. Unless the papers are wrong, I avoid current news. My clients pay me for the first call on investment issues they care about."

After an introductory trial period, and based on the recommendation of Youngdahl, Goldman Sachs determined to retain Peter Davis as a consultant. Goldman Sachs retained Davis in May 2001 and began paying him $1,500 per month for his services. Youngdahl was Goldman Sachs' main point of contact with Davis. A senior trader on the Treasury Desk (the "Senior Trader") was aware of the decision to hire Davis. During the trial period, Davis put several Goldman Sachs employees on his e-mail list in addition to Youngdahl, including the Senior Trader. Davis regularly transmitted e-mails to all clients, including Youngdahl and the Senior

Trader. In addition to these regular e-mails, Davis also communicated individually with Youngdahl by telephone and e-mail. In several of these various communications, Davis provided information that Davis specifically represented was derived from conversations with persons at the Treasury Department or from "Treasury sources."

In mid-July 2001, Davis and Youngdahl entered into an agreement whereby Davis would attend the Treasury Department's quarterly refunding press conferences and then provide Youngdahl with embargoed refunding information. Subsequently, on the morning of the Treasury Department's August 1, 2001, refunding announcement, which Davis attended, Davis called Youngdahl before the embargo was lifted and told him the exact types and amounts of securities that would be sold at the upcoming auctions. Davis was the only one of the consultants Goldman Sachs retained who communicated this information to Youngdahl in the minutes before the announcements.

6. Treasury Department's Announcement on October 31, 2001

On October 31, 2001, the Treasury Department's quarterly refunding press conference lasted from approximately 9:00 a.m. to 9:25 a.m. Treasury Department officials informed attendees, among other things, that the department planned to suspend issuance of the 30-year Treasury bond, a mainstay of the Government securities market. Pursuant to long-standing practice, Treasury Department officials also instructed attendees that the information conveyed at the conference was subject to an embargo. The embargo was set to expire at 10:00 a.m. Davis attended the October 31 press conference and understood that the information provided at the press conference was embargoed until 10:00 a.m. A Treasury Department employee, however, inadvertently published the information on the Treasury Department website at 9:43 a.m.

Shortly after learning that the Treasury Department had decided to suspend issuance of the 30-year bond, but before the expiration of the embargo period, Davis telephoned a number of his clients, including Youngdahl. Youngdahl worked in very close physical proximity to the traders on the Treasury Desk so that he could provide them with continuous discussions and running commentary about what he saw occurring in the economy or politics.

7. Goldman Sachs' Actions on October 31, 2001

Before Youngdahl received Davis' telephone call, Youngdahl, the Senior Trader and another 30-year bond trader on the Treasury Desk (the "Second Trader") had been aware that the Treasury Department was going to make its quarterly refunding announcement on the morning of October 31, 2001. Youngdahl also understood that the Treasury Department's quarterly refunding announcements were subject to a press embargo, which he understood to be a practice whereby information provided to the press is not to be disclosed until a specified time. Youngdahl and the Senior Trader also knew that the refunding information was confidential until publicly released because, at the time, the Managing Director of Goldman Sachs who supervised, among others, the Treasury Desk, represented Goldman Sachs on the Treasury Borrowing Advisory Committee ("TBAC"), an industry body that consults with and advises the Treasury Department on debt finance issues. Youngdahl and the Senior Trader were aware that, as a result of his TBAC membership, the Managing Director was prohibited from discussing quarterly refunding matters with them until the Treasury

Department released the refunding information to the public.[2] The Second Trader also understood that the Treasury Department Refunding information was embargoed until publicly disseminated by the press.

Youngdahl anticipated that the quarterly refunding announcement would be released at approximately 9:30 — 9:45 a.m. on the morning of October 31, 2001. Youngdahl marked this release time on the monthly calendar that he distributed to the traders on the Treasury Desk. However, sometime between 9:15 a.m. and 9:25 a.m. that day, Youngdahl saw a wire report stating that the Treasury Department would not release its refunding announcement until 10:00 a.m. Youngdahl then advised the Treasury Desk traders of the delay in the expected announcement time.

At 9:35 a.m., Davis telephoned Youngdahl and told him, among other things, that the Treasury Department would not sell any more 30-year bonds. Youngdahl told Davis to hold and muted his telephone. Youngdahl leaned back in his chair and advised the Senior Trader, "I wouldn't be short bonds if I were you." Other traders also heard Youngdahl's comment. This remark was the first specific trading advice that Youngdahl gave on October 31. Based on his prior agreement with Davis, Youngdahl knew that Davis was providing embargoed refunding information that he received from the Treasury Department's refunding press conference. Prior to October 31, Goldman Sachs' public position in research reports Youngdahl drafted was that the Treasury Department would continue to issue the 30-year bond and that traders should be long 30-year bond futures. Minutes before the Davis phone call, Youngdahl was also telling Goldman Sachs' salespeople that it was his position that the Treasury Department would continue issuing the 30-year bond.

After his comment to the Senior Trader, Youngdahl asked Davis to repeat the information. Youngdahl then told the Senior Trader that Davis had called, and relayed all of the substantive information that Davis provided. The Second Trader joined the conversation and also heard the statement that the 30-year bond would be discontinued.

Subsequent to Davis's 9:35 a.m. telephone call, and up to 9:43 a.m., Goldman Sachs' Treasury Desk made eleven purchases totaling $84 million par value of 30-year bonds in the cash market for Goldman Sachs' proprietary accounts, and did not sell any bonds. During this entire period, the Senior Trader and the Second Trader understood that the Treasury Department had not yet released the refunding announcement. The Treasury Desk sold these $84 million in bonds, among others, after 9:59 a.m. on October 31, making profits of $1,576,561. During the same time period, the Treasury Desk purchased a total of 2,336 bond futures contracts with a par value of $233.6 million. The only sale during this time period was of 100 contracts, or $10 million par value. After 9:51 a.m. on October 31, the Treasury Desk sold $233.6 million in bond future contracts (2,336 contracts), among others, making profits of $2,318,500.

8. Market Effect of the Information

The Treasury Department's announcement that it would no longer issue the 30-year bond had a dramatic effect on the price and yield of the 30-year bond in public trading. Over the course of the day on October 31, the bond price increased over $5.00 and the yield decreased 33 basis points from the previous day. The changes in price and yield in the 30-year bond following the announcement were the largest one-day changes since October 1987.

9. Goldman Sachs' Policies and Procedures to Prevent the Misuse of Nonpublic Information

During the relevant period, Goldman Sachs had a written manual entitled "Policies and Procedures Regarding Confidential or Proprietary Information, the Chinese Wall and Personal Trading." The manual set forth, among other things, prohibitions on the misuse of material confidential information, and policies for handling confidential information. "Confidential information" subject to those prohibitions and procedures was defined to include nonpublic information provided by an external source (such as a client, prospective client, or other third party) with the expectation that the information will be kept confidential and used solely for the business purposes for which it was conveyed by the external source. The manual further explained that confidential information may include "tips" received directly or indirectly from corporate insiders whether or not in the context of a client relationship. Treasury Desk employees also received an additional written statement concerning Goldman Sachs' confidentiality principles. The additional statement instructed Treasury Desk employees, among other things, that they should "treat as confidential all non-public information provided directly or indirectly by a client, prospective client or third party with the expectation that the information will be kept confidential."

During the relevant period, Goldman Sachs used numerous consultants who provided a wide range of information and analysis concerning political, budgetary, and regulatory developments in Washington. The Treasury Desk alone used at least six such consultants, not including Davis. Goldman Sachs paid these consultants for their services, and they provided information to Goldman Sachs for its use and benefit.

Goldman Sachs had no written procedures specifically addressed to the potential that consultants like Davis could obtain and provide material confidential information to the firm. No written guidelines expressly discussed the use of consultants or the handling of information obtained from consultants. Goldman Sachs' written procedures did not expressly address circumstances in which consultants like Davis conveyed information to Goldman Sachs with the expectation that Goldman Sachs would use the information, even though the consultant obtained the information from a source that intended the information to be kept confidential.

## B. LEGAL ANALYSIS

1. Sections 15(c)(1)(A) and 15(c)(1)(C) of the Exchange Act and Rule 15c1-2

Sections 15(c)(1)(A) and 15(c)(1)(C) of the Exchange Act prohibit the use of manipulative, deceptive, or other fraudulent devices or contrivances by broker-dealers and Government securities broker-dealers in over-the-counter transactions or transactions on exchanges where the broker-dealer is not a member. 15 U.S.C. §78o; *see Asch v. Philips, Appel & Walden, Inc.,* 867 F.2d 776, 777 (2d Cir.), *cert. denied,* 493 U.S. 835 (1989). Congress enacted the provisions of which Section 15(c)(1) forms a part "to provide for the establishment of a mechanism of regulation among over-the-counter brokers and dealers . . . to prevent acts and practices inconsistent with just and equitable principles of trade." H.R. Rep. No. 2307, 75th Cong., 3d Sess. (1938).

Congress has expressed its strong intent to preserve the fairness and

integrity of the Government securities markets.[3] Further, the antifraud provisions of the federal securities laws, which prohibit among other things insider trading, apply to debt securities, including Government securities, as well as to equity securities. *See SEC v. Morse*, 92 Civ. 64 (E.D.Ky. June 23, 1992); *In re Blythe & Co.*, 43 S.E.C. 1037 (1969); *United States v. Rough*, Crim. No. 88-425 (D.N.J. 1988).

By the conduct described above, Goldman Sachs violated Sections 15(c)(1)(A) and 15(c)(1)(C) of the Exchange Act, and Rule 15c1-2. Peter Davis misappropriated information concerning the suspension of 30-year bond issuances in violation of a duty of trust or confidence owed to the Treasury Department, the source of the information. *See United States v. O'Hagan*, 521 U.S. 642, 651 (1997); 17 C.F.R. § 240.10b5-2. John Youngdahl, Davis' tippee, violated insider trading prohibitions because he knew or should have known that the refunding information that he passed on to the traders at Goldman Sachs had been improperly disclosed to him in violation of such a duty. *See SEC v. Maio*, 51 F.3d 623, 634 (7th Cir. 1995) (tippee has duty not to trade when he "knew or should have known that [tipper's] disclosure was improper"); *see also SEC v. Sekhri*, 1998 U.S. Dist. LEXIS 7490, *5 (S.D.N.Y.), citing *SEC v. Musella*, 678 F. Supp. 1060, 1062 (S.D.N.Y. 1988). In particular, Youngdahl knew that Davis obtained the refunding information by attending the Treasury Department's press conference; that Davis was providing him with nonpublic refunding information in violation of the news embargo; and that such refunding information was intended to remain confidential until publicly announced.

Youngdahl's principal function on the Goldman Sachs Treasury desk was to advise the traders on that desk with respect to economic and political developments that affected their daily trading activity. Davis was a paid consultant to Goldman Sachs who was in regular contact with Youngdahl, but the firm did not have procedures reasonably designed to prevent the misuse of material, nonpublic information obtained from consultants like Davis. All of the trading at issue was undertaken for the benefit of Goldman Sachs in Goldman Sachs proprietary accounts. Under these circumstances, it is appropriate to hold Goldman Sachs liable for the conduct of Youngdahl, *see Suez Equity Investors v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) (corporate entity can be found liable for acts of its employees and agents), and for all bond trading profits that resulted from Youngdahl's conveying the information he learned from Davis, whether or not the individual traders knew or should have known that they were trading on improperly obtained nonpublic information. *See SEC v. Clark*, 915 F.2d 439, 454 (9th Cir. 1990) (tipper liable for tippee's trading profits where tippee not found liable because tippee was unaware of the breach of duty); *SEC v. Warde*, 151 F.3d 42, 49 (2nd Cir. 1998) ("tippee's gains are attributable to tipper, regardless whether benefit accrues to the tipper").

2. Section 15(f) of the Exchange Act

Section 15(f) of the Exchange Act requires brokers and dealers registered with the Commission to establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of such broker's or dealer's business, to prevent the misuse, in violation of the federal securities laws, of material, nonpublic information by such broker or dealer or any person associated with such broker or dealer. For the reasons described above, taking into consideration Goldman Sachs', and in particular the Treasury Desk's, regular use of paid consultants for their knowledge, contacts, and information concerning the federal Government, Goldman Sachs' policies were not reasonably designed to prevent the misuse of material nonpublic information received from such

persons.

The securities industry has long been aware of the need for effective compliance policies to guard against the risk of misuse of material nonpublic information, and the need to tailor those policies to the specific activities of the individual firm. *See, e.g., In re Guy P. Wyser-Pratte et al.*, Exch. Act Rel. No. 44283; Advisers Act Rel. No. 1943 (May 9, 2001). Goldman Sachs' Treasury Desk has regularly communicated with consultants who may at times possess material nonpublic information from Government sources. This interaction created a need to establish specific policies and procedures to address the potential receipt of such information by employees of the firm. Under these circumstances, the firm's policies needed to be particularly sensitive to the possibility of misuse and to include safeguards tailored to the particular risks attending such interactions with consultants possessing confidential Government information.

## C. CONCLUSION

As a result of the conduct discussed above, Goldman Sachs willfully violated Sections 15(c)(1)(A), 15(c)(1)(C) and 15(f) of the Exchange Act and Rule 15c1-2 thereunder.

Goldman Sachs' Cooperation

In determining to accept the Offer, the Commission considered the cooperation afforded the Commission staff by Goldman Sachs, including that the firm brought this matter to the staff's attention promptly.

**IV.**

### Undertaking

Goldman Sachs undertakes, within fifteen (15) days of the entry of this Order, to pay disgorgement and prejudgment interest for the bond futures transactions in the total amount of $2,562,740. Based on the fact that a civil action is pending in the United States District Court for the Southern District of New York captioned *SEC v. Peter J. Davis, et al.*, upon a complaint alleging violations arising from the same or substantially similar facts as those alleged herein, Respondent shall make payment to the Clerk of that Court pursuant to 17 C.F.R. § 201.611(b), together with a cover letter identifying the related action pending in that Court, the civil action number of that action, and the name of the Court. Respondent shall simultaneously transmit photocopies of such payment and letter to the SEC=s counsel in this action. By making this payment, Respondent relinquishes all legal and equitable right, title, and interest in such funds, and no part of the funds shall be returned to Respondent.

If, for any reason, the Clerk of the Court for the United States District Court for the Southern District of New York has not established a fund for the related action pending in that Court, such payment shall be: (A) made by United States postal money order, certified check, bank cashier's check or bank money order; (B) made payable to the Securities and Exchange Commission; (C) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Stop 0-3, Alexandria, VA 22312; and (D) submitted under cover letter that identifies Goldman Sachs as a Respondent in these proceedings, the file number of these proceedings, a

Goldman, Sachs & Co. : Admin. Proc. No. 34-48436 (September 4, 2003    Page 9 of 11

Case 1:09-cv-01543 Document #: 1 Filed: 03/11/09 Page 106 of 108 PageID #:106

copy of which cover letter and money order or check shall be sent to Lawrence A. West, Associate Director, Division of Enforcement, Securities and Exchange Commission, 450 5th Street N.W., Washington, DC 20549-0801. In determining whether to accept the Offer, the Commission has considered this undertaking.

**V.**

In view of the foregoing, the Commission deems it appropriate in the public interest to impose the sanctions specified in Respondent Goldman Sachs' Offer.

**ACCORDINGLY, IT IS ORDERED that:**

A. Pursuant to Sections 15(b)(4) and 15C(c)(1)(A) of the Exchange Act, Goldman Sachs is censured;

B. Pursuant to Section 21C of the Exchange Act, Goldman Sachs shall cease and desist from committing or causing any violations and any future violations of Sections 15(c)(1)(A), 15(c)(1)(C) and 15(f) of the Exchange Act and Rule 15c1-2 promulgated thereunder;

**IT IS FURTHERED ORDERED** that Goldman Sachs shall, within fifteen (15) days of the entry of this Order, pay disgorgement and prejudgment interest for the 30-year bond transactions in the total amount of $1,742,642. Based on the fact that a civil action is pending in the United States District Court for the Southern District of New York captioned *SEC v. Peter J. Davis, et al.*, upon a complaint alleging violations arising from the same or substantially similar facts as those alleged herein, Respondent shall make payment to the Clerk of that Court pursuant to 17 C.F.R. § 201.611(b), together with a cover letter identifying the related action pending in that Court, the civil action number of that action, and the name of the Court; and specifying that payment is made pursuant to this Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order pursuant to Sections 15(b)(4), 15C(c)(1)(A) and 21C of the Exchange Act of 1934. Respondent shall simultaneously transmit photocopies of such payment and letter to the SEC=s counsel in this action. By making this payment, Respondent relinquishes all legal and equitable right, title, and interest in such funds, and no part of the funds shall be returned to Respondent. A civil action captioned *SEC v. Peter J. Davis, Jr., et al.* based upon a complaint alleging violations arising from the same or substantially similar facts as those alleged herein is pending in the United States District Court for the Southern District Court of New York (the "District Court"). To minimize the costs of administering a plan of disgorgement, the Commission, pursuant to 17 C.F.R. § 201.611(b), is ordering that Respondent pay the required disgorgement funds into the District Court's registry just as Respondent is undertaking to pay other funds into the District Court's registry. Within a reasonable time after the final resolution of the related District Court matter, a proposed plan of disgorgement shall be submitted to the District Court for its approval.

If, for any reason, the Clerk of the Court for the United States District Court for the Southern District of New York has not established a fund for the related action pending in that Court, such payment shall be: (A) made by United States postal money order, certified check, bank cashier's check or bank money order; (B) made payable to the Securities and Exchange Commission; (C) hand-delivered or mailed to the Office of Financial

Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Stop 0-3, Alexandria, VA 22312; and (D) submitted under cover letter that identifies Goldman Sachs as a Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to Lawrence A. West, Associate Director, Division of Enforcement, Securities and Exchange Commission, 450 5th Street N.W., Washington, DC 20549-0801.

**IT IS FURTHER ORDERED** that Goldman Sachs shall, within seven (7) days of the entry of this Order, pay a money penalty in the amount of $5,000,000 to the United States Treasury. Such payment shall be: (A) made by United States postal money order, certified check, bank cashier's check or bank money order; (B) made payable to the Securities and Exchange Commission; (C) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Stop 0-3, Alexandria, VA 22312; and (D) submitted under cover letter that identifies Goldman Sachs as a Respondent in these proceedings and the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to Lawrence A. West, Associate Director, Division of Enforcement, Securities and Exchange Commission, 450 Fifth Street, N.W., Washington DC 20549-0801.

**IT IS FURTHER ORDERED** that within ninety (90) days of the entry of this Order (1) Goldman Sachs' Legal Department shall complete a comprehensive review, including recommendations, of the policies, procedures and practices maintained and implemented by the Respondent pursuant to Section 15(f) of the Exchange Act that relate to the findings of this Order; (2) Goldman Sachs shall adopt, implement and maintain policies, procedures and practices pursuant to Section 15(f) of the Exchange Act that are consistent with the findings of this Order and the recommendations contained in the comprehensive review; and (3) Goldman Sachs shall submit a report, approved by and signed by Goldman Sachs' Legal Department, to the staff of the Commission detailing the results of the review and the new policies, procedures and practices adopted pursuant to Section 15(f) of the Exchange Act.

By the Commission.

Jonathan G. Katz
Secretary

**Endnotes**

[1] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

[2] *See* Government Securities Act Amendments of 1993 (Pub. L. No. 103-202, 107 Stat. 2344), §202(c).

[3] The House report to the Government Securities Act Amendments of 1993 emphasized "reducing the disparity of information that may exist between market 'insiders' and 'outsiders' and providing public investors with more equal access to information that is available to primary and other dealers." H.R. Rep. No. 103-255, at 27 (1993). Similarly, the Senate report found that "expanded information access serves the public interest by enhancing

customer protection and providing for fair competition among market participants." S. Rep. No. 103-109, at 19 (1993). The report also stated, "The U.S. government securities market is one of the largest and most liquid securities markets in the world. It is also the most important securities market for U.S. taxpayers... Therefore, it is essential that when the Treasury auctions its bills, notes, and bonds, it must have broad participation from investors, who have confidence in the integrity of the market and are willing to participate in it." *Id.* at 7.

*http://www.sec.gov/litigation/admin/34-48436.htm*